## GENERAL ELECTRIC CO. v. HYGRADE SYLVANIA CORPORATION et al.

District Court, S. D. New York.
March 30, 1944.

See 61 F.Supp. 531.

Alexander C. Neave, of New York City (Harrison F. Lyman, of Boston, Mass., John H. Anderson, of Cleveland, Ohio, and Rowland V. Patrick, of Boston, Mass., of counsel), for plaintiff.

Gifford, Scull & Burgess, of New York City (Newton A. Burgess and H. H. Hamilton, both of New York City, of counsel), for defendant Hygrade Sylvania Corporation.

Dean S. Edmonds, of New York City (Delos G. Haynes, of St. Louis, Mo., and Elmer J. Gorn, of Newton, Mass., of counsel), for defendant Raytheon Mfg. Co.

LEIBELL, District Judge.

This action puts in issue (1) the validity and scope of a number of patents for electrical discharge devices and ultra violet lamps and (2) the infringement of the patents by the manufacture and sale of fluorescent and germicidal lamps.

## Patents in Suit

Plaintiff, General Electric Company, charges that claim 3 of patent No. 1,790,153 issued to Hull, January 27, 1931, for an electrical discharge device, and claims 6, 13, 25 and 27 of patent No. 2,182,732 issued to Meyer, Spanner and Germer, December 5, 1939 for metal vapor lamps, have been infringed by the defendant, Hygrade Sylvania Corporation, in the manufacture and sale of fluorescent lamps. The Hull and Meyer patents are owned by General Electric.

In a counterclaim the defendant Hygrade alleges that General Electric by the manufacture and sale of the General Electric fluorescent lamps and certain ultra violet germicidal lamps, has infringed claims 13, 43, 72 to 78 inclusive, and 80 of patent No. 2,201,817 issued to Charles G. Smith on May 21, 1940, for electronic space current discharge devices, and claims 1, 7, 11 to 13 inclusive, 25 to 30 inclusive, 41, 43, 48 and 49 of Reissue patent No. 21,954 to LeBel, reissued November 25, 1941, for an ultra violet lamp. Hygrade is the exclusive licensee of the Smith and LeBel patents, owned by defendant Raytheon Manufacturing Company.

The validity of still another patent was originally put in issue in this litigation—patent No. 2,096,693 for a luminescent coating for electronic lamps, issued to J. L. Cox, on October 19, 1937 and owned by Hygrade. General Electric sought a judgment declaring the patent invalid. Hygrade also counterclaimed on the Cox patent. Towards the end of the trial Hygrade conceded the invalidity of the Cox patent and consented to a decree granting plaintiff's prayer for a declaratory judgment and dismissing defendant's counterclaim on the Cox patent. Prior to the trial the defendant Hygrade consented that another pleaded counterclaim, based on patent No. 1,982,821 for an electrode, issued to Marsden and Wheeler on December 4, 1934 and owned by Hygrade, should be dismissed.

The Raytheon Manufacturing Company was made a party defendant by stipulation, because it holds the legal title to the Smith and LeBel patents. It had issued exclusive licenses to Hygrade on the Smith patent, in the fluorescent and germicidal fields, and had given Hygrade the right to sue thereon, shortly prior to the pleading of the Hygrade counterclaim in this action. A similar arrangement had been made between them in February 1940, in reference to the LeBel patent, a few months before the institution of this suit by General Electric.

## The Fluorescent Lamp

In November 1937 the General Electric Company put on its special selling list a lamp which produced a new kind of light, a fluorescent lamp, generally acknowledged as the greatest advance in lighting since the Edison invention of the incandescent lamp. The white light of the fluorescent lamp, per watt of electrical energy consumed, is three times as efficient as the incandescent lamp. In the field of colored lights the fluorescent lamp is many fold more efficient per watt than colored incandescent lamps. For green it is 200 fold; for blue 50 fold. The colors include blue, green, pink, gold and red—in addition to daylight and white. Fluorescent lamps made in cylindrical tubes an inch to an inch and a half in diameter and varying in length between eighteen inches and forty-eight inches, give off their light over a large surface. They have less glare and give off less heat than an incandescent lamp of the same wattage with its more concentrated light. The eighteen inch fluorescent lamps are 15 watts; the twenty-four inch—20 watts; the thirty-six inch—30 watts; the forty-eight inch—40 watts (see Exs. 5 and 6).

The great demand for fluorescent lamps for all kinds of lighting, in factories, in offices and in the home, is shown by the sales of General Electric fluorescent lamps since November 1937. In 1938 General Electric sold about 180,000 fluorescent lamps; in 1939—about a million; in 1940 over four and a quarter million; and in 1941—13,728,000 lamps. Hygrade copied in every detail the General Electric fluorescent lamps and began to market them in great quantities in 1939, falsely claiming for itself in extensive advertising that it was the creator of this "miracle in lighting." How many million fluorescent lamps Hygrade made and sold is not in the record, but that their sales were extensive cannot be denied.

The fluorescent material of the lamp is applied in the form of a phosphor coating on the inside of the elongated glass tube. When the ultra violet rays of 2536.7 Angstrom Unit wave lengths, emitted by the mercury vapor within the lamp, strike the phosphor coating it is activated and fluoresces and gives off light. The fluorescent lamps will operate on ordinary household and commercial A. C. current of 110–220 volts.

The phenomena by which the ultra violet rays of 2536.7 A. U. are produced within the sealed glass tube is as follows: Within the lamp, sealed in at each end of the tube, is an electrode which changes from negative to positive, on a 60 cycle A. C. current, 120 times a second, so that at the time the electrode at one end of the lamp is negative (a cathode), the electrode at the other end is positive (an anode). The electrodes are tungsten filaments coated with oxides of barium and strontium and are known as "Wehnelt" cathodes. The oxide coating helps the electronic emission from the cathodes so that they operate on less energy, start more readily and last longer.

The tube is of ordinary window glass. It is filled with an inert gas, argon, and a globule of mercury. The pressure of the argon gas, about three or four millimeters, does not vary much with the temperature of the lamp. The globule of mercury gives off a mercury vapor and its pressure does vary with the temperature. At about 70° F. (21° C.) the pressure of the mercury vapor within the lamp is about one micron (.001 of a millimeter). [Atmospheric pressure is 76 centimeters or 760 millimeters of mercury.] When the fluorescent lamp is in operation its temperature is 15-20° C. higher than that of the ambient air—a comparatively cold light. Taking into consideration the difference in temperature due to climate, the seasons, the time of day and the location of the lamp, the mercury pressure of the lamp, while in operation, may range from 4 or 5 microns to 39 microns.

The metal ends of the lamp fit into sockets. As supplementary equipment there is a switch, a choke or resistance, and a time delay switch. When the main switch is closed to start the lamp, the A. C. current flows through the choke, through the electrode in the lamp at one end, through the time delay switch, and then through the electrode at the other end of the lamp, and back to the A. C. supply. In this way the electrodes are preheated red-hot while the current is by-passed through a circuit, in which the time delay switch is located. During this preheating process none of the current passes through the tube itself. Preheating reduces the required starting voltage. The preheating is for a predetermined interval of a few seconds until the time delay switch automatically opens its contacts. Thereafter the current passes from one electrode to the other, through the gaseous mixture within the lamp. The choke aids in starting the discharge and controls the value of the current flowing through the lamp. The electrical discharge consists of a stream of electrons—negative units of electricity—which flow from the negative electrode (the cathode) toward the positive electrode (the anode).

When the lamp is in operation, the electrodes are of different voltage or electrical potential. The force which causes the electrons to move from cathode to anode is the electrical field which exists between the two electrodes, due to their different voltage. That difference is known as the voltage drop between them. The size and quality of the electrode is very important. Heated electrodes coated with alkali earth oxides give off most readily the greatest emission of electrons. An electrode thus heated is termed a thermionic cathode and the emissions therefrom "thermionic emissions." General Electric lamps use preheated Wehnelt cathodes, which Hygrade copied.

### Ionization

The pressure of the two gases in the tubes aids the passage of the current from cathode to anode. If the tube contained no

gas it would be difficult for the current to flow from cathode to anode at a low voltage, because of the presence of "space charge," which is practically eliminated in the gas filled lamp. The electrons, emitted by the Wehnelt cathode when the lamp is in operation, act upon the gases (argon and mercury vapor) within the tube and cause ionization. This phenomena, ionization, has been explained by plaintiff's expert, Dr. Clifton G. Found, about as follows: An atom consists of a positively charged nucleus surrounded by a number of electrons, the number depending upon the kind of atom it is. An argon atom nucleus is surrounded by 18 electrons; a mercury nucleus by 80 electrons. The negative charges of the electrons and the positive charge of the nucleus offset each other, so that the normal state of an atom is neutral. When the electrons emitted from the cathode in the gas filled tube collide with the neutral gas atoms, the collision may knock free an electron from the parent atom upsetting the even balance of positive (nucleus) and negative (electrons) within the atom, and rendering the gas atom, after it has lost an electron, positive instead of neutral. The generation in this manner of positive gas atoms within the tube is called "ionization."

That part of the tube where these positive ions neutralize a great number of emitted electrons is known as the "positive column," in which the space charge is zero. The argon gas within the fluorescent lamp is itself sufficient to produce the ionization necessary to neutralize the space charge. This eases the passage of electrons from the cathode to the anode and thus fulfills one purpose for which the argon gas is placed in the tube. But argon gas does not give off ultra violet radiation, which is required to make the phosphor coating of the tube fluoresce.

### Excitation

As the lamp in operation becomes heated the globule of mercury gives off a mercury vapor, containing atoms of mercury. If the force with which the electrons travelling from cathode to anode collide with the mercury atom is not sufficient to separate an electron of the mercury atom from its nucleus, but is sufficient to move an electron from its normal position in the atom to a position farther removed from the nucleus though still an integral part of the parent atom, then as the dislocated electron returns to its normal position in the mer-

cury atom it gives up in the form of radiation the energy imparted to it by the colliding electron. The radiation thus created by the dislocated electron returning to its normal position in the mercury atom is ultra-violet. This phenomena of the electrons in the current through the tube disturbing the normal position of electrons of the mercury atoms is known as the "excitation" of the mercury. The predominant radiation thus produced is of a wave length of 2536.7 A. U. [Angstrom unit is the term generally employed in physics in expressing the wave length of light. It is one hundred millionth of a centimeter. The visible range of spectrum, from violet to red, lies between 4000 Angstrom units for violet and about 7200 Angstrom units for red. The "ultra violet" is a radiation of a shorter wave length than the visible violet light and it is not visible to the human eye. Likewise, there are invisible radiations that have a longer wave length than visible red light; they are called "infra-red radiation."]

The voltage with which the electron hits the mercury atom in the fluorescent lamp determines whether excitation or ionization of the atom takes place. If the electron has a speed of between 4.9 and 10.4 volts excitation takes place, if the electron's voltage is 10.4 volts or more, the mercury atom will be ionized.

Mercury is liquid at ordinary temperatures and while in the liquid state will have some vapor near its surface, depending upon the temperature of the coolest part of the tube. When the fluorescent lamp is started it is generally at a temperature too low to ionize the mercury atoms quickly. As a result the argon atoms are the atoms first ionized and the electric discharge takes place first through the argon. That is one reason why argon gas is used. The heat of the lamp in operation increases the pressure of the mercury vapor and the striking action of the electrons emitted from the cathode causes the excitation of the mercury atoms so that they give off the ultra violet radiation. In addition to this excitation of mercury atoms, some mercury atoms become ionized, so that the mercury vapor is both ionized and excited during the operation of the fluorescent lamp. The mercury vapor is the principal source of the radiation emitted. By regulating the energy with which the electrons collide with the gas atom in a gaseous discharge device the relative extent of excitation and

ionization may be varied. Once the mercury is vaporized by the heat of the lamp in operation on the low voltage A. C. current, both the excitation and ionization will be in the mercury vapor, because the ionization voltage for argon is about 16 volts, higher than that of the mercury vapor which is about 10.4 volts.

There are several hundred times as many argon atoms per unit of volume in the lamp as there are mercury atoms, because of the difference between the argon pressure and the mercury pressure. The argon gas, in addition to supplying the medium through which the current is first discharged, later performs the important function of having its argon atoms get in the way of the positive mercury ions thus slowing down their speed as they journey towards the cathode, so that when the mercury ions strike the cathode they do so at a greatly reduced speed. Thus the argon gas is also a factor in prolonging the life of the cathode.

The lamp is designed to keep the mercury vapor at the proper normal pressure. The mercury pressure depends on the temperature which of course is affected by the amount of current supplied. The pressure of the mercury vapor within the lamp is such that it gives off the greatest amount of ultra violet rays of the most useful wave length, 2536.7 A. U.

In a germicidal lamp, the tube is made of a special uviol glass, pervious to ultra violet rays, so that these rays may be used outside the lamp for germicidal and therapeutic purposes. Of course the tube of a germicidal lamp has no coating of fluorescent material. Hygrade charges that the General Electric 15 Watt, 30 Watt and 40 Watt germicidal lamps infringe the Smith and LeBel patents. General Electric's germicidal 15 and 30 Watt lamps are of the same size, shape and construction as the General Electric fluorescent lamps of the same wattage, except that the tubes are of a glass pervious to ultra violet rays and no fluorescent coating is used. "Fluorescent substances used in lamps absorb ultra violet energy, reradiate it at the longer wave lengths which are visible to the eye."

### Hygrade Copied General Electric's Fluorescent Lamps

It is not necessary to review in detail the development of the fluorescent lamp at General Electric's lamp laboratories. Dr. Thayer, who was in charge of this work, produced thirteen volumes of records of the research and experimental work which he supervised in the years 1935, 1936 and 1937. His experiments included research into the proper size and shape of the tube, the construction and location of the cathode, its preheating, current control, the use of pressure of gases, the various kinds of fluorescent materials, their mixture in a proper coating, the use of auxiliary equipment, and other details. One of the fluorescent lamps developed by General Electric during this research period was exhibited at the Convention of the Illuminating Engineering Society held at Cincinnati, September 3-6, 1935 (Ex. 47). The April 1936 issue of a General Electric publication, "The Magazine of Light" (Ex. 28) described the construction of its fluorescent lamps. They were not listed for sale until November 1937 (when they were put on a special schedule), because further efforts were being made by General Electric to perfect the lamp commercially. About 11,500 lamps were made in its laboratories, in the course of these experiments. On April 1, 1938, a complete line of fluorescent lamps of various sizes, colors and wattage, were placed on the General Electric regular stock schedules.

Defendant Hygrade Sylvania was a competitor of General Electric in the manufacture and sale of electrical illumination equipment. If their staff had not seen or heard of the General Electric fluorescent lamp exhibited at the Cincinnati Convention in September 1935, they probably saw the account of the fluorescent lamp in the April 1936 issue of the "Magazine of Light," for which Hygrade subscribed. One of the men in the Hygrade laboratories, Mr. J. Cox, in an office document dated May 15, 1936 (Ex. GG) entitled "April Research Report" stated that "During the month work was started on the development of a gaseous low pressure high efficiency 15 Watt fluorescent lamp." The experiments did not result in any satisfactory lamps. "Lamp failures on life were due to sputtering of active material away from the cathode and the clean-up of gas to prevent restarting." The principal trouble was with the cathode. He had some success in developing a fluorescent coating and method of applying it to the tube (Ex. GG-1; Ex. HH-1). October 8, 1937 there appears an entry by Mr. Cox in the Research Monthly Report (Ex. GG-2): "Due to the press of other work we have not been able to devote much time

to fluorescent lamps. We have however made up a dozen lamps and built and installed six lamps in a hood over the Hygrade lamp sign on the front of building A. The sign is burned each night from 5 P. M. to 8 A. M."

On December 16, 1937, the Chairman of the Hygrade Board wrote a letter (Ex. 12) to a Vice-President of General Electric asking for at least one sample of General Electric's fluorescent gaseous discharge lamp to aid Hygrade."in judging what the future of this product may be." The letter ended with the statement that the Chairman of Hygrade would "handle the matter with proper discretion" and that General Electric's Vice-President would have "no cause for any embarrassment as far as the use of the sample by our organization (Hygrade) is concerned." The samples were accordingly sent by General Electric to Hygrade on January 14, 1938, in full confidence that Hygrade would keep its word and would not "make any commercial use of the sample" (Ex. 12-A). A further letter (Ex. 12-B) from General Electric to Hygrade referred "to the limitations of the usage to which the samples are to be put." The Chairman of the Board for Hygrade acknowledged the receipt of the samples, expressed his thanks for the courtesy, and wrote (Ex. 12-C), "I again repeat my assurance that you will not have any occasion to regret rendering us this service." Exhibit NNN dated January 20, 1938, and Exhibit NNN-1 dated January 31, 1938, records of Hygrade's Engineering Department, show the receipt of three General Electric fluorescent lamps and the prompt analysis by Hygrade of the structure of the lamps, in particular the cathodes.

In October 1938 Hygrade put upon the market a line of fluorescent lamps that were exactly similar to the General Electric lamps. General Electric had improved its lamps between January 1938 and October 1938 and even these improvements were copied and embodied in the Hygrade product of October 1938. A comparison of the General Electric fluorescent lamps (Ex. 5) and the Hygrade fluorescent lamps (Ex. 6) shows how completely Hygrade copies the General Electric line—not only in the size and color of the bulbs, the socket and auxiliary equipment, such as the starting and preheating items, but in the interior components, geometry and construction. Defendant's only explanation for the copying

was the necessity of standardization in the public interest, so that any consumer sockets would hold the lamps of both companies. But the standardization did not have to include the essential elements of the interior of the lamp construction, which made the General Electric fluorescent lamp a long-lived, commercially useful fluorescent lamp.

Defendant asserts that it had no need to copy plaintiff's General Electric lamps because Hygrade "had merely to copy its own two 1934 lamps." The only two notebook entries relating to the August and September 1934 Hygrade experiment (read into the record) give no information from which one could begin to construct a fluorescent lamp. The August 13, 1934 entry is headed "Whitelight, high pressure mercury arc tests" and tells of applying a fluorescent material, aluminum oxide. The results were "very good at low intensities but no good at high intensities"—and the same result was obtained when a fluorescent red material was used. The September 6, 1934 entry states: "No. 3 fluorescent spectra: An attempt was made to add red light to the mercury spectrum by coating the inside of the lamp with a red fluorescent substance. Unless the mercury pressure was very low the red light from the fluorescence was not noticeable." There is no mention of a rare gas, such as argon, in combination with the mercury. The Hygrade experiments tried to correct the ghastly light of a mercury vapor lamp. The experiments were unsuccessful and abandoned. The attempt to build up these meager records of Hygrade's 1934 experiments by oral testimony, to give them the appearance of a successfully operated fluorescent lamp, failed utterly.

The May 15, 1936, Hygrade memorandum entitled "April Research Report" (Ex. GG) shows that it was during the month of April that the "work was *started* on the development of a gaseous low pressure high efficiency 15 Watt fluorescent lamp." Defendant Hygrade has not shown to my satisfaction that it had developed any kind of a fluorescent lamp in 1934. General Electric was the pioneer in developing a commercially useful fluorescent lamp—not Hygrade.

■ We must not let the success of the General Electric fluorescent and germicidal lamps blind us in determining the issue of the validity and the scope of plaintiff's patents in suit. As Judge Learned Hand has

recently warned in Derman v. Stor-Aid, Inc., et al., 2 Cir. 1944, 141 F.2d 580, 583:

"An article may have an extraordinary success and may indeed be an invention of high merit, and yet that success and that invention may have nothing whatever to do with the combination described in the claims, but may depend upon elements, which, though added to those of the prior art, the patentee did not introduce in his claims, and perhaps could not have introduced. Although there is no better test than history, when used with proper circumspection, it is never safe to accept success alone as the measure of invention."

In an infringement suit the "comparison must be of the defendant's device with the patent in suit, and not with plaintiff's commercial device." Tampax, Inc. v. Personal Products Corporation, D.C., 38 F.Supp. 663 at page 667, citing Hartford-Empire Co. v. Obear-Nester Glass Co., 8 Cir., 39 F.2d 769. See, also, S. S. Kresge Co. v. Davies, 8 Cir., 112 F.2d 708. If the General Electric fluorescent lamps did not embody the inventions described in the Hull and Meyer patents, then Hygrade in copying the General Electric lamps would not infringe those patents. And if the claims of the Hull and Meyer patents, in suit were invalid, they could not be infringed.

### The Hull Patent No. 1,790,153

Plaintiff's first cause of action for patent infringement is based upon claim 3 of patent No. 1,790,153 (Ex. 1) issued January 27, 1931, to Albert W. Hull of Schenectady, assignor to General Electric Company. The patent is for "an electrical discharge device and method of operation." The application for the patent was filed in the Patent Office October 15, 1927, and bears serial No. 226,276 (Ex. L).

Claim 3 of the patent as issued, reads as follows:

"3. The combination of an electric current source having a voltage materially greater than fifty volts, an electrical discharge device connected thereto comprising a thermionic cathode, an anode, a container therefor, and a gas therein having a pressure within the range of several microns to several millimeters of mercury and means for maintaining the ion bombardment voltage with respect to said cathode less than a critical value characteristic of the nature of the gas in said container at which destructive disintegration of said cathode would occur."

The above claim was added to patent application No. 226,276 as claim No. 20 by an amendment filed June 11, 1928; that in turn was derived from a claim, No. 33, which had been filed as an amendment to Mr. Hull's earlier application, bearing serial No. 594,370, on June 1, 1927. (See, Ex. MM–1.)

The old claim 33 was allowed by the Patent Office December 31, 1927. On September 17, 1929, the applicant requested the Patent Office to cancel claim 33. In the "Remarks" of his counsel annexed to the request the following appears: "Allowed claims 33 and 34 have been cancelled because their subject matter belongs in applicant's continuation case, serial No. 226,-276 and the claims were placed in that case as claims 20 and 21 by amendment therein filed June 8, 1928." Claims 20 and 21 at first were rejected but later were allowed in application No. 226,276. When patent No. 1,790,153 was issued claim 20 of the No. 226,276 application became claim 3 of the patent as issued. It is identical in language with old claim 33 of the prior application, No. 594,370.

In the second paragraph of the specification of the Hull patent in suit, the inventor states:

"The present invention relates to electrical discharge devices of the thermionic type. It is the object of my invention to provide an improved device of this type which is capable of a greater current carrying capacity, higher efficiency and a longer life than has been characteristic heretofore of devices of this character."

The "longer life" characteristic of the device pertains particularly to the thermionic cathode and its protection from disintegration by ion bombardment.

In reviewing the art as known when his specifications were filed, Dr. Hull states that there were then in use two distinct types of thermionic power devices, one of which operated with a pure electron discharge and with practically no gas ionization because there is only a negligible gas pressure (vacuum devices). In this type, high voltages were required to overcome space charge and about one third of the transmitted energy was lost. The second type was a thermionic device "in which a gas is present at relatively high pressures, that is, pressures materially above one mil-

limeter of mercury, and usually as high as about five centimeters of mercury, although even higher pressures may be utilized." In this second class of "concentrated arc devices" are the Tungar Rectifier and high pressure mercury lamps. The function of the gas in this second type, is to furnish positive ions to neutralize the space charge of the electrons and "allow large currents to pass from cathode to anode when the potential difference between them is only slightly greater than or even less than the ionizing potential of the gas." Their cathode drop is "not materially greater than the ionizing potential of the gas." Hull does not here use the term "cathode drop" but he uses its equivalent, namely, "the potential difference between the cathode and the space immediately around it in the direction of the current flow." The cathode drop is therefore such that the velocity of the positive ions "arrive at the cathode with very small energy, and their impact upon it causes no material disintegration." The velocity of the ions in these tubes where the gas is at a high pressure is also reduced "by collisions between the ions and molecules of the gas as the mean free path of ions at these pressures is only a few thousandths of a millimeter."

The specification of the Hull patent goes on to state: "Between these two ranges of pressure, namely, the very low pressure of the pure electron discharge devices on the one hand and the relatively high pressures of the concentrated arc devices on the other hand, there is a range of pressures from about one millimeter to about one millimeter (1,000 microns) of mercury pressure which has never been considered practical for use in any thermionic devices of the power type. All attempts to use pressures within this range have resulted in excessive disintegration of the cathode. In fact, it has generally been observed in the concentrated arc discharge range of pressures, that the lower the pressure the shorter has been the life of the cathode. When the pressure has been reduced to a millimeter or less, the cathode has lasted only a few hours."

The inventor then states in his specification that his present invention includes both a new apparatus and a new method of operating the thermionic discharge and that his discharge device contains gas ranging in pressure between about one micron and one millimeter. He then says that he has

"discovered that thermionic tubes containing gas at a pressure in this range when suitably constructed and exhausted, may be operated with power currents for long periods without appreciable disintegration of the cathode"; that he has operated tubes of this low pressure diffuse discharge type for more than 4,000 hours without any material change in the appearance of the cathode or in its electron emissivity.

Hull discloses, as the principal requirement of his invention, that the "positive ions which strike the cathode should have an energy less than a value represented by a critical or limiting voltage (referred to hereafter as the disintegration voltage) which varies with the atomic weight of the gas filling. The disintegration voltage is always greater than the ionization voltage of the gas. The disintegration voltage for mercury vapor is about 22 volts, for argon about 25 volts and for helium about 50 volts (the ionization voltages of these gases being 10, 15 and 25 respectively)."

In addition to stating the basic principle of his device, the inventor explains the features that must be embodied in the construction of successful devices. He says: "The most important of these is that the cathode should be so proportioned with respect to the load or space current which the tube is designed to carry, that its electron emission in the absence of positive ion bombardment shall be equal to or greater than the maximum instantaneous value of the current through the tube." He notes that devices of this type as made theretofore were inoperable because the electron emission of the cathode was itself inadequate, and that the device worked for a while only because the inadequate electron emission of the cathode was supplemented by electrons produced at the cathode by the positive ion bombardment, which in so doing disintegrated the cathode. He says that in accordance with his invention "The cathode emission is obtained at an operating temperature at which thermal vaporization is inappreciable and since disintegration by positive ion bombardment is avoided the cathode has a commercially long life."

His second requirement for the construction of successful devices is that the electrodes and all other parts of the tube should be thoroughly freed from any harmful gas and that the gas filling actually used should be "inert or chemically harmless with respect to the cathode."

His third requirement is "that the cathode shall be capable of being maintained at the operating temperature with a current that will not produce a magnetic field sufficient to raise the potential between the cathode and the space immediately around it above the disintegrating value, and that the maximum potential difference between parts of the cathode shall be small compared with the disintegrating potential." The first part of this requirement relates to the "cathode drop," which will be considered later.

His fourth requirement relates to the spacing between the electrodes and the general geometry of the device, which the inventor says "shall be properly related to the pressure of the gas or vapor content." "The electrodes must be spaced apart far enough and the volume of the space available for ionization must be sufficiently great so that the number of ions formed will be sufficient to eliminate space charge." Further the "product of gas pressure and distance between the remotest parts of the electrodes must not be sufficient to permit a glow discharge to pass between the electrodes in the absence of thermionic emission." He then gives an example of the geometry of a device containing a mercury vapor, operating at a range of 1 to 40 microns for voltages materially above 100 volts.

Hull says, too, that in one form of his device the cathode is so constructed as to prevent local hot spots on the cathode, so that there will be no deleterious concentration of the space current upon the cathode, and that "this feature is of particular utility in devices provided with cathodes coated with an alkaline earth oxide or other activating material."

The various figures (drawings) annexed to the Hull patent relate mostly to rectifiers embodying the invention, but figure 10 describes a form of lamp. The inventor explains it as follows:

"Fig. 10 shows one form of such a lamp on a reduced scale, the elongated envelope 70 being shown broken as its length may be varied with the length of illuminating column desired. The cathode 71 and the anode 72 are spaced apart such distance ordinarily that the total voltage drop is several times the ionization voltage of the gaseous filling which may be neon, mercury vapor, or other gas having a desired luminosity. In a direct current lamp, such as shown in Fig. 10, the permissible gas pressure may be materially higher than in a rectifier. In the case of neon in such a lamp, a pressure of about two to five m.m. may be employed. Such a lamp about 50 to 60 c.m. in length, and about 2.5 c.m. in diameter may be operated at 110-120 volts with a luminous over-all efficiency of about 10 lumens per watt. In the case of a lamp, such as shown in Fig. 10, in which the length of the positive column is considerable, starting will be facilitated by applying high frequency in the known manner."

Dr. Hull is a scientist favorably known for his research in the field of electrical discharge devices. He has written a number of articles on this subject for scientific magazines, including publications of the General Electric Company Research Laboratory, some of which are in the File Wrapper of his patent application. In the File Wrapper, Exhibit MM-1, on application No. 594,370, which resulted in the issuance of patent No. 1,790,152, there appear the following scientific articles by Dr. Hull.

1. An article read before the National Academy of Sciences on November 19, 1928, and later published in the General Electric Company Research Laboratory Magazine on the subject of "Control of an Arc Discharge by Means of a Grid," written by Dr. Hull and one of his associates at the General Electric Laboratory, Irving Langmuir.

2. An article by Dr. Hull, on the subject of "Gas-filled Thermionic Tubes" published by the General Electric Company Research Laboratory under date of November 1928. This article is important and its subject matter is quite pertinent. The opening paragraph states:

"This paper describes a fundamental principle of thermionic gas tube operation, by which cathode disintegration may be entirely avoided. A new type of cathode is also described which requires much less heat energy than any hitherto used. With these improvements hot cathode gas tubes appear to be practical, and their fundamental characteristics as lamps, rectifiers and 'thyratrons' are briefly described".

Page 2 of the article contains two paragraphs which show that the scientific fraternity knew the meaning of certain terms that are used in the specification of the Hull patent in suit. I quote the two paragraphs as follows:

"The starting point of the developments described in this paper was the discovery that disintegration is produced only by the

488

impact of ions of more than a definite kinetic energy. The critical value lies between 20 and 25 volts for the common inert gases. Any precaution which avoids the presence of ions faster than this will prevent disintegration.

The simplest precaution is to adjust the circuit resistance so that the total 'cathode drop' does not exceed this critical value, which may be called the *disintegration voltage*. Fortunately, the disintegration voltage is in all cases considerably above the ionizing potential, so that it is possible to obtain the ionization necessary for carrying large currents without exceeding the disintegration voltage. In properly constructed tubes the necessary and sufficient condition for keeping the cathode drop within safe limits is that the cathode electron emission shall be equal to the maximum current demand."

The article then describes the operation of the disintegrating voltage in relation to a thorium-coated cathode. The paper relates certain experiments by Kingdom and Langmuir with cathodes made of cold thoriated films and their determination of the number of thorium atoms removed per positive ion at different voltages. Dr. Hull explains similar experiments with hot filaments and large positive ion currents having somewhat lower voltages. He submits a table showing the condition and life of common cathodes (oxide coated—thoriated tungsten-pure tungsten) at various temperatures, and he points out the advantages of tubes containing gas and their greater use of the electron emission. In the File Wrapper on the earlier application there is also an article by Dr. Hull, published by the General Electric Company Research Laboratory on the subject of the "Hot-Cathode Thyratron," which is an "electrostatically controlled arc rectifier."

The inventor's attorney, in discussing the nature of the plaintiff's invention, stated in a paper filed in the Patent Office on June 7, 1928:

"For the operation of such a power discharge a cathode must be provided which is capable of emitting the required current thermionically, substantially independently of positive ion phenomena. In other words, the cathode must be big enough and efficient enough to maintain the space current without the assistance of bombardment by positive ions."

The bombardment of the positive ions would release electrons from the cathode and thus assist in maintaining the required space current, but in doing so the ion bombardment would be destructive of the cathode itself, and thus in a short time would kill the goose that laid the golden egg.

Hull obtained the requisite thermionic cathode emissions by properly proportioning the cathode to the load or space current and by operating at a "temperature at which thermal vaporization is inappreciable." This, together with the means he took to avoid destructive ion bombardment of the cathode, resulted in the cathode having a commercially long life. The destructive ion bombardment was avoided in Dr. Hull's device by having its construction conform to the third requirement, as to the cathode drop. Dr. Hull specified that "the cathode shall be capable of being maintained at the operating temperature with a current that will not produce a magnetic field sufficient to raise the potential between the cathode and the space immediately around it above the specified disintegrating value," which when mercury vapor is used "is about 22 volts" and "for argon about 25 volts."

Various claims of the Hull patent use the expression a "voltage drop at the cathode," or "voltage drop in the neighborhood of the cathode." Communications from the applicant's attorneys to the Patent Office, while the application for the patent was under consideration, contained similar expressions. In the "Remarks" of the applicant's counsel submitted under date of June 7, 1928, the following appears:

"The circuit conditions must be such that the voltage drop at the cathode does not exceed a limiting voltage, herein called the disintegration voltage. New devices or new arrangements are not necessarily present in such a circuit. For example, the current may be limited by an ordinary resistance, or by the load itself, to a value at which the cathode drop is below the disintegration voltage."

The expression in the patent, "potential drop at the cathode," means the same thing as "voltage drop at the cathode" or "cathode drop."

An analysis of the construction of the fluorescent lamps, both plaintiff's and defendants', show that they operate for a satisfactorily long commercial life without the electrodes disintegrating, because the cathode drop is between 18 and 21 volts according to the size of the lamp, and in all instances is less than the limit of "about

22 volts" specified as the disintegrating voltage when mercury vapor is used, and the limit of "about 25 volts," the disintegrating voltage for argon.

Defendants' attack on the method employed by Dr. Found, plaintiff's expert, in determining the cathode drop, and upon his calculations is unconvincing. First it is intimated that the defendants do not understand the term "cathode drop" to mean what Dr. Found says it means. The patent itself and the scientific articles written by the inventor, Albert W. Hull, make clear its meaning. "Cathode drop" and "cathode voltage drop" mean the voltage drop at the cathode sheath, in the space immediately adjacent to the cathode, as explained by Dr. Found. The term has the same meaning as the "potential drop at the cathode." Defendant's experts knew its correct meaning. Indeed, the Smith patent, on which defendant Hygrade counterclaims, uses the expression "cathode voltage drop."

Defendants argue that a measurement by a probe within the tube, in the immediate vicinity of the cathode, would be more reliable than Dr. Found's external method. If Dr. Found had inserted a probe in one of the Hygrade tubes (instead of measuring from the outside) it would have materially altered the conditions within the tube, if it did not completely destroy them. The defendant Hygrade could have made its own measurements on its own tubes, according to what it considered a better method. It is proper to assume that defendants would have done so, if they had believed that the experiment would contradict Dr. Found's calculations or would show any fallacy in the teaching of the Hull patent on that point. Dr. Found applied his method in measuring the cathode drop in General Electric Company's fluorescent tubes and got substantially the same results as in his measurements of the similar Hygrade tubes. One of the defendant's experts said that he did not know how to measure the cathode voltage drop, while the other expressed the view that the cathode drop was of the order of the ionization voltage of the gas in the tube, which would embrace Dr. Found's figures.

In defendant Hygrade's fluorescent lamps every element of claim 3 of Hull's patent is present. We have the following combination:

(1) "An electric current source having a voltage materially greater than 50 volts."

Defendant's fluorescent lamps operate on an alternating current of 110-220 volts.

(2) "An electrical discharge device connected thereto." The fluorescent lamp is an electrical discharge device. The lamp comprises:

a. A "thermionic cathode," i.e., the heated electrode which is emitting the electrons in the current stream, while the lamp is in operation. The thermionic cathode is well known to the defendants and their experts. The term is used in the Smith and LeBel patents on which defendant is counterclaiming.

b. "An anode," i.e., the electrode to which the current of electrons is traveling.

c. "A container therefor," i.e., the glass tube.

d. "A gas therein." In the fluorescent lamps there are two gases—argon and mercury vapor. Defendants devote a large part of their argument to prove that the Hull patent is limited to containers with only a single gas. I do not think it should be so limited. The Hull patent mentions both mercury vapor and argon. It does not say they should not be used in combination. The patent's requirements are met in the fluorescent lamps as to both gases, in that the cathode voltage drop is less than the specified disintegration voltages for mercury vapor and argon.

e. "Having a pressure within the range of several microns to several millometers of mercury." The mercury vapor and the argon gas, in both the plaintiff's and defendant's lamps, are within this pressure range. The fluorescent lamps have a gas pressure of 3 to 4 millimeters. The mercury vapor pressure is between 1 and 40 microns.

The defendants argue that what the inventor, Hull, staked off for himself was a range between one micron and one millimeter. The second type of thermionic device referred to in the history of the art, as set forth in the specification, was a thermionic device in which gas is present at a relatively high pressure "materially above one millimeter of mercury and usually as high as about five centimeters of mercury." It was in a range below that that Dr. Hull claimed his device would have a commercially long life where the other devices would not. I believe the range of the gas specified in claim 3, to wit, several microns to several millimeters of mercury is proper and is not inconsistent with the patent

specification taken as a whole. At times defendant's stand seems to be that under the Hull specification a gas pressure higher than one millimeter is permissible but not necessary. The language of claim 3 fixes its own range and is not inconsistent with the specification.

f. "Means for maintaining the ion bombardment voltage with respect to said cathode less than a critical value characteristic of the nature of the gas in said container at which destructive disintegration of said cathode would occur." As hereinabove indicated, the specification of the patent tells us that this critical or limiting value is characteristic of the nature of the gas used; and for mercury vapor it is about 22 volts, for argon about 25 volts. The specification also tells us that "The disintegration voltage is always greater than the ionization voltage of the gas and that the ionization voltage of these gases is 10 and 15 volts respectively." The teaching is clear. Hygrade Sylvania's fluorescent lamps follow the teachings of the Hull patent and infringe claim 3.

Fluorescent lamps use an oxide-coated cathode, not a thoriated cathode, so the defendants advance a number of arguments for limiting Hall's claim 3 to thoriated cathodes. In the earlier Hull application (#594,370) there was considerable discussion of thoriated cathodes. Claim 3 of the patent in suit is the same as claim 33 of the prior application. From that the defendants conclude that claim 3 should be limited to a thoriated cathode. The argument is inherently weak. Further, no reference is made in claim 3 to any thoriated cathode. In the specification of the patent in suit, we find references to other types of cathodes. For instance, on page 3, line 46 of the printed patent, we read: "This feature is of particular utility in devices provided with cathodes coated with an alkaline earth oxide or other activating material," and on the same page, at line 69, there appears: "Fig. 9 is a graph of the volt-ampere characteristic of an arc discharge from an oxide-coated cathode, and Fig. 10 is a condensed view of a lamp embodying my invention." The thoriated cathode is shown in only one of the figures in Hull's patent in Fig. 1. Where details are given in the specification on any of the other figures, an oxide-coated cathode is indicated.

It is of no special importance, that claim 3 of the patent in suit is the same as claim 33 of Hull's earlier application, relating in part to thoriated cathodes. But it is significant that in the application on which the patent in suit was granted cathodes other than thoriated cathodes are included and that claim 3, by its language, is not limited to thoriated cathodes.

The term used by Dr. Hull in claim 3 is a "thermionic cathode." If he had intended to limit the type of cathode to a "thoriated cathode" he would have said so. And if he believed that the claim should apply only to an oxide-coated cathode, he would have so specified. The term "thermionic cathode" embraces both the thoriated cathode and the oxide-coated cathode. Where the inventor, in any of his claims under this patent, wishes to specify the metal content or composition of the cathode he does so specifically. In claim 2 he specifies "a thermionic cathode constituted of a body of sheet nickel"; in claim 5, "a thermionic refractory metal cathode provided with a material having a higher electron emissivity than said metal"; in claim 13, "said cathode comprising a body coated with activating material of higher electron emissivity than said body"; in claim 14, "a thermionic cathode constituted of a base metal coated with a layer of higher electron emissivity than said metal." It thus appears from the patent itself that the inventor in claim 3 deliberately chose the broader term "thermionic cathode."

But he defendants argue that the Court should give the narrow interpretation they seek, because of the presence of the word "critical" in the last clause of claim 3. If the word "critical" had been omitted from claim 3, the defendants admit there would be nothing to their contention. Defendants say that there is no "critical" value, where an oxide-coated cathode is used, although there may be a "limiting" value. That is a rather finely spun distinction. In either case it means the disintegration voltage when a certain gas is used, as the specification clearly shows. There is a value (dependent upon the inert gas used) at which the cathode would be exposed to a destructive bombardment of the released gas ions (unless the teachings of the Hull patent are followed) whether a thoriated cathode or an oxide-coated cathode is employed. The "critical or limiting voltage" is the "disintegration voltage." The "disintegration voltage" is a characteristic of the gas, not of the cathode. It bears a relation to the atomic weight of the gas filling. All this is explained in the patent

specification. The "ion bombardment" is something to be controlled because of its effect on the cathode. The kinetic energy of the released gas ions is raised when they enter the field of the cathode drop, so that they impinge on the cathode with the energy thus picked up at the cathode drop. To control that energy and keep it below a certain range was one of Hull's objectives. Assuming that the effect of the ion bombardment is not as destructive on an oxide-coated cathode as on a thorium coated cathode, it is at best a question of degree. The inventor's discovery of a way in which to reduce the force of the ion bombardment to a minimum, would help the life of the cathode, in either case.

Plaintiff's expert, Dr. Found, definitely stated that there is a disintegrating voltage that is critical for an oxide-coated cathode, and that where mercury vapor is used, such as in Figure 9 of the Hull patent, the disintegrating voltage is the same for both an oxide-coated cathode and a thoriated cathode, to wit, 22 volts. To limit claim 3 to a thoriated cathode, as defendants now assert it should be limited, would run counter to the clear implication of the consent decree entered in December 1934, wherein the No. 872 A tube (a rectifier) of the defendant Hygrade, containing an oxide-coated cathode, was held to infringe this same claim 3 of the Hull patent.

As a sweeping defense, defendant argues that the Hull invention does not contribute to the long life of the cathode, that it is the presence of the argon gas which produces that result. While the use of the argon gas at the right pressure in the fluorescent lamp furnishes protection to the cathode, because the argon gas aids in starting the lamp and thereafter its atoms slow down the movement of mercury vapor ions towards the cathode, the argon gas is not the sole protection of the cathode. In and of itself, the presence of the gas within the pressure range covered by the Hull patent, would not be sufficient to prevent the disintegration of the cathode, unless the invention of the Hull patent was followed in other respects. It is no answer to say that if the argon gas is removed, the lamp will not work. The gas is only one element. If you removed the electrodes or failed to properly proportion or space them, the lamp would not work. But that would not prove that the argon gas at the proper pressure is not an essential factor. Argon gas is necessary in the fluorescent lamp; but to know that fact is not enough in itself, as the failures recorded in the notebooks of Mr. Cox, a research worker in Hygrade laboratories, show.

Finally, defendants argue that the Hull teachings are not followed because the electrodes in the fluorescent lamps do wear out, although they last for 2500 hours under ordinary conditions. Of course they do not last forever, but the fewer times they are started the longer they last. If they are permitted to burn steadily, they give their best service. It is in the starting that the greatest damage is done to the electrodes, because at that moment the cathode drop exceeds the specified disintegration voltage for mercury vapor, which proves the truth of Hull's teaching. But in ordinary use these fluorescent lamps will operate for more than two and a half times the commercial life of incandescent lamps, which have a commercial life of about 1000 hours.

Hull's invention in patent No. 1,790,153 is employed in the fluorescent lamp in order to prolong the life of the cathode. The other essential features of the fluorescent lamps will be considered in discussing the Meyer, Spanner and Germer patent No. 2,182,732.

In an earlier suit by plaintiff, General Electric Company, against defendant Hygrade Sylvania Corporation, for infringement of certain claim of Hull patent No. 1,790,153, defendant consented to the entry of a final decree (dated December 18, 1934) adjudging claim 3 and other claims of said patent valid and infringed "by the defendant's manufacture and sale of electrical discharge devices utilizing the inventions of each of said claims." Defendant's infringing device in that suit was a rectifier known as tube No. 872 A. As between the parties to this present suit that decree is conclusive on the issue of the validity of claim 3. Wilson v. Haber Bros., 2 Cir., 275 F. 346; O'Cedar Corporation v. F. W. Woolworth Co., 7 Cir., 66 F.2d 363. However, that decree does not bar the defendant from offering proof in this case as to the state of the prior art, for the purpose of showing the scope of claim 3 of the Hull patent, on the issue of noninfringement. Skelton v. Baldwin Tool Works, 4 Cir., 48 F.2d 221. The Court may consider the state of the art to construe and narrow the claims of a patent, although a defendant is estopped from attacking the validity of the patent claims. Westinghouse Co. v.

492

Formica Co., 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316.

The defendants cite as prior art against Hull, a patent issued to George Stanley Meikle, also of Schenectady and also an assignor to the General Electric Company. The Meikle patent was issued May 9, 1916 and bears number 1,182,290. The original application was filed October 9, 1914 and was later divided. Meikle states that his invention relates to "the rectification of alternating current, of a current and voltage range comparable to the range of the mercury arc rectifier, and is embodied in a device having an electron-emitting cathode, and anode or anodes." He also states that his device is distinguished "in one aspect from various prior devices containing an incandescent cathode by the presence of inert gas at a considerable pressure." He adds:

"Although no very definite lower limit of pressure can be assigned, for practical purposes the gaseous pressure should not be much below one millimeter of mercury as at very much lower pressures a rapid electrical disintegration of the cathode occurs."

The specification of the patent explained how the device is made. The main envelope consists of a ball with three arms for a full wave rectifier, or with two arms for a half wave rectifier. The envelope is first carefully evacuated and baked out at a high temperature. Then a quantity of inert gas is introduced in the envelope.

"The gas is preferably at a relatively considerable pressure, for example, at a pressure varying from about one centimeter of mercury pressure upward to atmospheric pressure. No definite lower limit of pressure can be assigned, but the pressure should be high enough to largely suppress electrical disintegration of the cathode by the bombardment of ions."

This would put Meikle's device in the class of concentrated arc devices mentioned by Hull as the second type of "thermionic devices in which a gas is present at relatively high pressures" and the high pressure serves as a protection for the cathode.

It is clear from the specification of Meikle's patent that his device was designed to operate with the inert gas at a relatively high pressure. His claims support that view. Claim 8 of his patent refers to a device with a filling of inert gas having at the operating temperature of the device "a pressure materially above one millimeter of mercury." Claim 7 refers to a device with a filling of inert gas having at the operating temperature of the device a pressure of "at least about one centimeter of mercury." Claim 2 refers to a pressure sufficiently high to give an electrical discharge emanating from the cathode, when at incandescence, the electrical characteristics of an arc. Hull's specification recognizes the existence of rectifiers in which the gas filling is at a high pressure, but Hull's device was designed to operate at a gas pressure of between several microns and several millimeters. What Meikle sought, according to his specification, was to keep away from the lower range of gas pressure which Hull showed could be used.

Defendant says it follows Meikle and not Hull. The Meikle patent has expired. But defendant does not follow Meikle, who states in his specification (Lines 29 to 44 of p. 1):

"The electrical characteristics of my new rectifier are substantially those of an electric arc.

"My invention is embodied in a device containing a cathode, of highly refractory material, such, for example, as tungsten, and an anode or anodes having a heat dissipating capacity enabling continuous operation at a given rated capacity at a temperature below about 727° C., at which temperature electron emission is relatively negligible, this device being filled with an inert gas of relatively appreciable pressure, preferably of the order of magnitude of atmospheric pressure."

The fluorescent lamps operate at a temperature of only 15-20° C. above the ambient air and the argon gas pressure is only 3 to 4 millimeters.

■ Because of the great importance of fluorescent lamps, there is a "public interest" involved in this litigation, which required a careful inquiry into the validity of the Hull patent notwithstanding the December 1934 consent decree. I have made that inquiry and my conclusions are hereinabove expressed. For an analogous situation see Nachman Spring-Filled Corporation v. Kay Mfg. Co., 2 Cir., 139 F.2d 781.

The Meyer, et al. Patent No. 2,182,732

The application for this patent was filed in the United States Patent Office December 19, 1927. After a long and bitterly contested journey a patent, containing twenty-eight claims, emerged on December 5, 1939.

The last nineteen of these claims were added by amendments in October 1939 after General Electric had acquired the patent application by assignment in May 1939. The first nine claims were the subject of an equity suit brought by applicants' assignee, Electrons, Inc., under R.S. § 4915, 35 U.S.C.A. § 63, to compel the Commissioner of Patents to issue a patent containing those claims. The Court of Appeals for the District of Columbia decided in favor of the applicants in August 1938 (Electrons, Inc. v. Coe, 69 App.D.C. 181, 99 F.2d 414) holding the claims patentable.

The original application for the patent was entitled "Source of Chemically Active Spectral Rays." Shortly before the patent was issued the application was amended November 13, 1939, by substituting a new title "Metal Vapor Lamp"—"for the purpose of making the title more apt and descriptive of the invention involved."

The specification of the patent as issued is in practically the same language as the original application, with only a few minor amendments. The opening paragraph of the specification states:

"Our invention relates to the production of chemically active spectral rays and more especially to means whereby chemically active rays such as ultra-violet rays can be produced and utilized in a particularly simple, efficient and economical manner."

After referring to the so-called quartz lamp (Ex.22) as the only practical useful source of ultra-violet rays then known, the specification remarks that the quartz lamp is cumbersome, that it operates only on direct current unless complicated connections are used, that it cannot be operated from the ordinary house lighting current so as to produce only small quantities of ultra-violet rays, and that "the great intensity of ultra-violet ray emission forbids the handling of these lamps except by experts." The specification goes on to state:

"On the other hand it is very desirable indeed to provide a source of ultraviolet rays which can be handled and installed anywhere without any danger and which can be operated direct with alternating current from the house lighting system without requiring any special igniting means."

The applicants then describe what they "have found":

"* * * that a source of chemically active rays is presented in the combination of a gas-filled tube, for instance an argon or neon filled tube, such as is in general use for the purposes of advertising, with an admixture of metal vapor, for instance mercury vapor, to the gas in the tube, the tube itself being preferably made of a material highly pervious to ultra-violet rays, such as quartz, or uviol glass, or being provided with an opening closed by such material."

"If a voltage is connected with the electrodes forming part of such a tube, a glow current will pass between the electrodes which will also ionize the mercury molecules which will now emit great quantities of ultraviolet rays. Owing to the presence, in the tube, of a gas, for instance a rare gas, besides the metal vapor, such lamp can be operated with alternating current and can therefore be connected directly with any house lighting system.

"We have further found that combined gas and metal vapor lamps for high capacity can be ignited easily without requiring a high voltage, if the ordinary (cold) electrodes are replaced by or combined with hot (incandescent or glow) cathodes. We may for instance use tungsten cathodes, but we have found it particularly convenient to use the kind of glow cathodes known under the name of Wehnelt-cathodes, which do not require any heating current, it being possible to cause the cathodes to be heated by the ion current itself upon the glow discharge having been started by means of one of the well known auxiliary connections. This latter mode of operation is particularly recommendable if it is desired to operate with direct current."

The applicants then describe some of the uses to which their ultra-violet lamp can be put. The specification adds:

"In all these cases the quantity of ultraviolet rays emitted can be regulated with great nicety and low voltages can be applied without any danger of the lamp being extinguished."

Then follows a paragraph relating to fluorescent material:

"If the envelope, tube or bulb forming part of the lamp is made or formed with coatings or jackets of partly or entirely fluorescent material, the lamp can also be used with advantage for advertising purposes."

The specification refers to the drawing annexed:

"Fig. 1 shows a tubular lamp 1, filled with a rare gas or gases, to which is admixed a metal vapor such as mercury vapor, 2,

2 are glow cathodes supplied wtih alternating current."

During operation, according to the specification, the Wehnelt cathodes do not require any heating "it being possible to cause the cathodes to be heated by the ion current itself."

Of the nine claims before the Court in the equity suit brought by Electrons, Inc., under R.S. § 4915 only claim 6 is involved in this litigation. An interference was declared by the Examiner October 12, 1938, between that claim and a claim in an application by LeRoy J. Buttolph (an employee of General Electric Company) for a patent on Vapor Arc Lamps. The Buttolph claim of priority was withdrawn and General Electric submitted in October 1939 as amendments to the Meyer application nineteen additional claims which were granted as claims 10 to 28 inclusive of the Meyer patent when issued. Of those additional claims, 13, 25 and 27 are in suit.

The four Meyer claims in suit read as follows:

"6. A metal-vapor lamp comprising a vessel adapted to provide a discharge path defined by the walls of said vessel, a Wehnelt type cathode and a cooperating electrode disposed at opposite ends of said path, and a filling of inert gas and metal vapor; the normal electron emission of said cathode and the pressure of inert gas being adapted to start and support a low voltage gaseous discharge in said path, the said gaseous discharge being adapted to raise the metal-vapor density throughout the path sufficiently to make the metal vapor the main source of emitted rays."

"13. A mercury vapor lamp comprising a vessel adapted to provide a discharge path defined by the walls of said vessel, a Wehnelt type cathode and a co-operating electrode disposed at opposite ends of said path, a filling of inert gas and mercury vapor, the normal electron emission of said cathode and the pressure of inert gas being adapted to start and support a low voltage gaseous discharge in said path, the said gaseous discharge being adapted to raise the mercury vapor density through-out the path sufficiently to make the mercury vapor the main soruce of emitted rays and luminescent material enclosed in said vessel."

"25. A mercury vapor lamp comprising an elongated vessel, a filling of rare gas and mercury vapor, the latter constituting, in operation, the main source of spectral ray emission, and two fixed main discharge electrodes, at least one of which is a Wehnelt type cathode, spaced apart in said vessel to form therebetween a luminous discharge column defined by the vessel wall."

"27. A mercury vapor lamp comprising an elongated vessel, a filling of rare gas and mercury vapor the latter constituting, in operation, the main source of spectral ray emission, two fixed main discharge electrodes, at least one of which is a Wehnelt type cathode, spaced apart in said vessel to form therebetween a luminous discharge column defined by the vessel wall and fluorescent material disposed in the path of said spectral ray emission."

The following quotation from the decision of the United States Court of Appeals for the District of Columbia in Electrons, Inc. v. Coe, 69 App.D.C. 181, 99 F.2d 414, gives a brief history of proceedings in the Patent Office on the Meyer application, and of the suit in equity under R.S. § 4915:

"This is an appeal from an order of the District Court of the United States for the District of Columbia dismissing, after a hearing on the merits, a bill of complaint filed by the appellants under Rev.Stat. § 4915, as amended, 35 U.S.C.A. § 63. The bill sought to authorize the appellee, the United States Commissioner of Patents, hereafter referred to as the Commissioner, to issue a patent for a gaseous discharge lamp on the application of Friedrich Meyer, Hans Joachim Spanner and Edmund Germer, No. 241,034. The application will be referred to hereafter as the Meyer application.

"The application was filed on December 19, 1927, and included claims 49 to 51 and 53 to 57. All of these claims except 54 were rejected by the primary examiner on the ground that they did not disclose invention in view of a prior French patent to Risler, No. 607,650. Claims 49, and 53 to 56, were rejected upon the further ground that they contained 'new matter,' i.e., matter not disclosed in the specification. Claim 54 was rejected as not disclosing invention in view of United States patents to Kruh, No. 1,032,914 and to George, No. 1,671,109. The Board of Appeals reversed the primary examiner on all of these points and allowed all of the claims. Then the examiner suggested that, in view of the position of the Board of Appeals, another claim, 58, would be allowable, and the application was amended to include it. All of the foregoing, however, preceded the

decision in the United States Court of Customs and Patent Appeals of In re Zecher, 1934, 70 F.2d 270 [21 C.C.P.A. (Patents) 1041], wherein it was held that Kruh and George taken together anticipated an application by Zecher and another for a patent upon a gaseous discharge lamp. After this decision the primary examiner requested that he be restored to jurisdiction of the Meyer application in order that he might reject all of the claims of Meyer as unpatentable over Kruh and George for the reasons set forth by the court in Re Zecher, supra. This request was granted and the examiner then rejected all of the claims upon the theory that the Meyer claims were similar to those involved in Re Zecher, supra, and that that case was binding upon the Commissioner. The Board of Appeals, upon the same theory, sustained the examiner, and then upon a petition for rehearing adhered to its own decision. The trial court followed the final ruling of the Board of Appeals, although it did not in terms refer to the Zecher case in its findings of fact and conclusions of law. We discuss the claims in the Zecher case and the ruling of the Court of Customs and Patent Appeals at greater length hereafter. The sole question presented for decision in the instant case is whether or not the disclosure of the Meyer application constitutes invention over the references cited by the Commissioner, particularly Kruh and George."

The appellate court concluded that while Kruh and George disclosed the elements of the Meyer devise, neither of them disclosed the use of these elements in the combination that formd part of the Meyer invention and that the Meyer combination produced a new and useful result constituting invention. The Court cited among other authorities, Claude Neon Lights v. E. Machlett & Son, 2 Cir., 27 F.2d 702 on the question of invention in a new combination of old elements.

Concerning the Zecher case, on the authority of which the Board of Appeals at the Examiner's suggestion reversed its former ruling holding the Meyer claims patentable, the Court of Appeals for the District of Columbia had this to say (99 F.2d at page 424):

"And the issue principally discussed in the briefs, both of Zecher and of the Commissioner of Patents, was whether or not an ultra violet ray discharge tube shaped and fabricated as above described [like a wide U], with the principal object of safety for the operator, was invention. No such question is presented in the instant case. Moreover the record in Re Zecher, supra, shows that neither the Court of Customs and Patent Appeals nor the tribunals of the Patent Office had the advantage of testimony like that in the instant case, and it was therefore not made apparent either in the court or in the Patent Office in Re Zecher, supra, that the combination of elements and principles involved in the Meyer application—and possibly under the Zecher claims—would result in elimination of the disadvantages of the early art and the accomplishment of production of ultra violet rays in a much more efficient way."

The District Court of Appeals then concluded:

"We think accordingly that In re Zecher, supra, is largely without persuasive value for the instant case, and being convinced on our own part that invention resides in the Meyer claims and that the first decision of the Board of Appeals thereon to such effect was sound, we conclude that a patent should have issued to the appellants and that the trial court should have so ruled."

■ The decision in the Electrons, Inc., case is prima facie evidence in the case at bar, of the invention of the Meyer patent over the prior art cited against it in that suit. Rosenberg v. Groov-Pin Corporation, 2 Cir., 81 F.2d 46.

■ That a combination of old elements producing a new result may be a patentable invention, see, Levin v. Coe, 76 U.S. App.D.C. 347, 132 F.2d 589 at 596, and cases there cited.

### The "Abandonment" Issue and the Meyer Application

Before discussing the scope and meaning of the Meyer claims and their alleged infringement by Hygrade, certain preliminary objections to the validity of the Meyer patent and some of its claims, will be considered.

Defendant argues that the applicant took the wrong course in withdrawing his appeal to the Court of Customs and Patent Appeals (filed February 1, 1935) from the adverse ruling of the Board of Appeals; that the last lawful action of the Patent Office on the Meyer application was the decision of the Board of Appeals in December 1934 sustaining the Examiner's rejection of all claims; that the institution of the equity suit under R.S. § 4915 on May 2,

1935, was a nullity; that so many years have elapsed since the Board's adverse decision of December 1934, without the applicant having taken any lawful action, that the applicant must be deemed to have abandoned the patent application altogether.

■ "Abandonment" is pleaded as a special defense. R.S. § 4920, 35 U.S.C.A. § 69. The question of abandonment is one of intention. It is a question of fact depending on the record in each case. Electric Battery Co. v. Shimadzu, 307 U.S. 5, 59 S.Ct. 675, 83 L.Ed. 1071. In the time and effort devoted to the equity suit under R.S. § 4915 in the Supreme Court of the District of Columbia and the appeal to the Court of Appeals for the District of Columbia there is no evidence of any intention to abandon the Meyer patent application or any of the claims involved in that litigation. In fact there was renewed activity in the Patent Office in relation to the Meyer application as soon as the District Court's decree on the Appellate Court's mandate was entered in September 1938. An interference proceeding followed promptly, and when that was settled the Meyer application was amended by the addition of a number of new claims. I have shown in another part of this opinion that the final decree in the Electrons, Inc., equity suit entered on the decision and mandate of the appellate court cannot be attacked collaterally in this action, so that the whole structure of defendant's argument on this issue collapses.

■ As a subdivision of its claims of abandonment defendant argues that the history of the Meyer application in the Patent Office shows that the applicant abandoned original claims bearing the numbers 16 and 17, relating to the use of fluorescent material; that while those claims were thus abandoned for about eleven years, fluorescent lamps were put on the market by plaintiff and defendant; that it was not until after General Electric acquired the Meyer application (in May 1939) that claims including fluorescent material were added to the Meyer application in October 1939.

In the specification of the Meyer patent as issued there are two references to the use of fluorescent material. One of them I quoted above as follows:

"If the envelope, tube or bulb forming part of the lamp is made of or formed with coatings or jackets of partly or entirely fluorescent material, the lamp can also be used with advantage for advertising purposes."

That statement was in the application as originally filed, which also contained two claims, then numbered 16 and 17, reading as follows:

"16. Source of ultraviolet rays comprising an envelope consisting of a luminescent material highly pervious to ultraviolet rays, a mixture of a current-conductive gas and a metal vapor enclosed in said envelope, and means for producing electric discharges across said mixture."

"17. Source of ultraviolet rays comprising an envelope consisting of a material highly pervious to ultraviolet rays, a mixture of a current-conductive gas and a metal vapor and a luminescent substance enclosed in said envelope, and means for producing electric discharges across said mixture."

By Office Action on June 22, 1928 all the claims were rejected including said claims 16 and 17, which the Examiner stated were "met by French patent 589,856 and Ger. pat. 308,488." Meyer then sought to amend in many respects—including a direction to the Commissioner to cancel that part of the specification referring to luminescent materials and all the original claims, except claim 15. This, of course, eliminated claims 16 and 17 above quoted. The applicant stated that in canceling all claims but claim 15 he had not done so because of the art cited, "but for an opportunity to rewrite the claims to overcome the formal objections thereto and to more clearly and specifically set forth the features of the invention to aid in differentiating from the art cited." However, the above-quoted part of the specification relating to the use of luminescent material, and claims 16 and 17 were not rewritten and were omitted from the application as amended August 29, 1928. In the applicant's "Remarks" on the amendments sought, he stated:

"It is interpreted that German patent 308,488 is cited to bring out that the use of luminous substances in discharge tubes is old, and not that this patent has any direct bearing on the matter of a source of ultraviolet rays. The matter of luminosity is not specifically made a feature of the claims as rewritten.

"French patent 589,856 cited against claims 16 and 17 for the feature of luminosity is noted, and as before stated this

No

feature per se is not made a part of the rewritten claims. This patent however, throws considerable light upon the general relation of the art cited to the invention of applicants. As before pointed out, all of the art cited broadly against the feature of the production of ultraviolet rays is limited to the matter of producing light for illumination purposes, and none of it makes any use of the incidental production interiorally of the envelope of ultraviolet rays, except French patent 589,856, and the use made of it in this patent clearly points out the great difference between the invention of applicants and the art cited. Commencing at line 22 and continuing through line 36, page 1, the French patent makes clear that that part of the energy in the lamp which goes towards the production of ultraviolet rays is a loss in the matter of illumination, and the patent purposes the unique feature of converting the energy of this ultraviolet ray component from its invisible frequency to a visible frequency by the use of luminous substances, thereby saving this energy for useful application to the specific purpose to which the lamps of all of the references are directed. This pointedly brings out that applicants are now taking a component which in the other lamps cited was a detriment and are putting this component to a useful end in a specific and practical way, and that the mere incidental production of ultraviolet rays in illuminating lamps with no provision made for the use of these rays exteriorly of the lamp is not sufficient to anticipate the most useful invention of the present application of applicants."

By office action June 23, 1932, all amended claims down to that date were rejected. On October 12, 1932, the applicants asked the Commissioner to "cancel the specification and claims and insert the following specification which is a verbatim copy of the specification as originally filed, and the following claims which attempt to rewrite the subject matter of the present claims in a way to differentiate more clearly from the prior art." That amendment restored the above quoted part of the original specification relating to the use of a luminescent material in the envelope, tube or lamp, but the claims as rewritten made no mention whatever of the use of any luminescent material.

In all the proceedings in the patent office between June 23, 1932, and May 2, 1935, when the equity suit was instituted by Electrons, Inc. (then Meyer's assignee), under R.S. § 4915 no suggested amendment to any claim made any reference to the use of luminescent material. The decree on the mandate was entered by the District Court in the Electrons, Inc., case on September 10, 1938, and a certified copy was filed in the Patent Office.

Then followed an interference proceeding, declared by the Examiner October 12, 1938 involving claim 55 of the Meyer application and claim 56 of an application for a patent filed by one Buttolph, an employee of General Electric Company. The interference proceeding is discussed in another part of this opinion and it resulted favorably for the Meyer application October 11, 1939, on a concession of priority by Buttolph, dated October 9, 1939. At that time General Electric owned the Buttolph application and also the Meyer application subject to certain outstanding licenses.

On October 6, 1939, applicants submitted as amendments, certain additional claims, numbered 59 to 73, which became claims 10 to 24 inclusive of the patent when issued. (Claims 60, 61, 62, 66, 68, 69 referred to luminescent material.) Finally by a paper dated October 31, 1939, and filed in the Patent Office November 2, 1939, the Commissioner was requested to amend the specification by adding a sentence: "The fluorescent material may be enclosed in said envelope." And by adding claims 74 to 77, which became claims 25 to 28 inclusive of the patent when issued. In his "Remarks" on said requested amendment, applicants' attorney called attention to the addition of fluorescent material in claims 76 and 77 and stated:

"The specification has been amended to include the feature of the fluorescent material being enclosed in the envelope of the lamp as called for in original claim 17."

To summarize: It appears from the File Wrapper of the Meyer application that the references to luminescent material originally contained in the specification and claims 16 and 17 as filed December 19, 1927, were eliminated by applicants on August 28, 1928, after the citation by the Examiner of certain references to the prior art; that the original specification, including the paragraph on luminescent material, was restored by amendment on October 12, 1932, but claims 16 and 17 were not; that nothing further was added to the specification in relation to luminescent material

until October 31, 1939, and no claim embodying luminescent material was part of the application between August 28, 1928, and October 6, 1939.

In my opinion this constituted an abandonment by Meyer of any claim to the use of luminescent material with the metal vapor lamp. It was deliberately made in the face of specific objections of the Examiner based on the citation of certain patents in the prior art alleged to have anticipated Meyer. Original claims 16 and 17 were thus abandoned August 1928. In September 1935 the General Electric Company exhibited its fluorescent lamp at the Cincinnati exposition and in April 1938 the General Electric fluorescent lamps were listed for sale commercially.

General Electric Company acquired title to the Meyer application in May 1939. The application was amended October 9, 1939, to add claim 13, and on November 3, 1939, to add claim 27, both involved in this litigation. Claim 13 ends with a provision for "luminescent material enclosed in said vessel"; and claim 27 calls for "fluorescent material disposed in the path of said spectral ray emission." This was done by General Electric to strengthen its patent position on fluorescent lamps. But public rights had intervened. The General Electric fluorescent lamps had been put on the market extensively in April, 1938. Abandonment, plus the intervening public rights, render invalid these new claims 13 and 27 of the patent as issued, in so far as they include luminescent or fluorescent material. Dwight & Lloyd Sintering Co. v. Greenawalt, 2 Cir., 27 F.2d 823, 832; Jones v. Freed-Eisemann Radio Corporation, D. C., 48 F.2d 300, 309; Victor Talking Mach. Co. v. Brunswick-Balke Collender Co., D. C., 290 F. 565, at page 575, affirmed, 3 Cir., 8 F.2d 41. If "courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed * * * the effect of which would be to enable the patentee * * * to appropriate that which has, in the meantime, gone into public use" (Railway Co. v. Sayles, 97 U.S. 554 at page 563, 24 L.Ed. 1053), it seems to me that the same principle would apply to the situation here presented.

It is apparent that claim 25 of the patent as issued differs only slightly in wording from claim 6, which was in the application as filed December 19, 1927, and was one of the claims before the Court of Appeals of the District of Columbia in the suit of Electrons, Inc. v. Coe, 69 App.D.C. 181, 99 F.2d 414. The lamp described in the specification and in claim 6 could be termed a metal vapor lamp or a mercury vapor lamp. The vessel or tube of the lamp is shown as elongated in all the figures of Meyer's original application. The same is true of claim 27 compared with claim 6, if we eliminate the objectionable concluding clause of claim 27, i. e., the provision— "and fluorescent material disposed in the path of said spectral ray emission." Likewise if we cut off the clause— "and luminescent material enclosed in said vessel"— from claim 13, that claim will read practically word for word with claim 6, except that the words "mercury vapor" are substituted for "metal-vapor." This change to a narrower term, is fully justified by the teachings of the Meyer application as originally filed.

### The Judgment in the Equity Suit under R. S. § 4915 Cannot be Attacked Collaterally

The File Wrapper of the Meyer application (Ex. K.) shows that the Board of Appeals of the Patent Office on December 28, 1934, decided finally that the Examiner was right in rejecting all the claims of the Meyer applicants in view of the C.C.P.A. decision in In Re Zecher, 70 F.2d 270, 21 C.C.P.A. (Patents) 1041. On January 8, 1935, applicants' attorneys asked the Board of Appeals to make certain affidavits (then being filed) part of the record in the case so as to be available "in appeal to the Court of Customs and Patent Appeals." On February 1, 1935 applicants filed their notice of appeal, with reasons, with the Commissioner of Patents. They later (March 19, 1935) obtained from the Commissioner an extension of sixty days in which to order a transcript of the record. On May 2, 1935, they filed with the Commissioner of Patents a notice that:

"Applicants hereby withdraw the notice of appeal to the Court of Customs and Patent Appeals filed herein on or about February 1, 1935."

The File Wrapper contains the following memorandum signed by Solicitor of the Patent Office:

"A suit in Equity under Section 4915 R. S., entitled Electrons Inc., Ericha Meyer as Executrix of the Estate of Friederich Meyer, deceased, Hans J. Spanner and Edmund Germer v. Conway P. Coe, Com-

missioner of Patents, Equity No. 58,691, involving this application was filed on May 2, 1935, in the Supreme Court of the District of Columbia."

A later postcript to said memorandum states:

"Above suit terminated by decision rendered August 8, 1938 of the United States Court of Appeals for the District of Columbia reversing the decree of the lower court and holding applicants entitled to a patent containing the claims in suit."

The Appellate Court's decision is reported in 69 App.D.C. 181, 99 F.2d 414.

There is nothing in the File Wrapper to show that the Commissioner took any formal action on the applicant's notice of the withdrawal of the appeal to the C.C.P.A., although the Commissioner later participated in the equity suit on the assumption that the notice of appeal to the C.C.P.A. had been properly withdrawn.

Title 35 U.S.C.A. § 59a, R.S. § 4911, provides:

"If any applicant is dissatisfied with the decision of the board of appeals, he may appeal to the United States Court of Customs and Patent Appeals, in which case he waives his right to proceed under section 63 of this title. * * *"

And title 35 U.S.C.A. § 63, R.S. § 4915, provides:

"Whenever a patent on application is refused by the Board of Appeals * * *, the applicant, unless appeal has been taken to the United States Court of Customs and Patent Appeals, and such appeal is pending or has been decided, in which case no action may be brought under this section, may have remedy by bill in equity, if filed within six months after such refusal or decision; and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim or for any part thereof, as the facts in the case may appear. * * *"

Rule 149 of the Rules of Practice of the United States Patent Office, as revised February 1, 1929, and amended January 29, 1930, 35 U.S.C.A.Appendix, states in part:

"149. When an appeal is taken to the U. S. Court of Customs and Patent Appeals, the appellant shall give notice thereof to the Commissioner, and file in the Patent Office, within forty days, exclusive of Sundays and holidays but including Saturday half holidays, from the date of the decision appealed from, his reasons of appeal specifically set forth in writing.

"If an applicant in an ex parte case appeals to the U. S. Court of Customs and Patent Appeals he waives his right to proceed under section 4915 R.S. (U.S.C.A. title 35, sec. 63). * * *"

■ If the defeated applicant wishes to appeal to the C.C.P.A. he has forty days in which to do so, figured from the date of the decision of the Board of Appeals. (Rule 149 quoted above. Wilcox v. Coe, D.C.D.C. 33 F.Supp. 714.) If the applicant fails to appeal in time to the C.C.P.A. he still has a remedy in an equity suit under R.S. § 4915, provided he brings suit within six months after his application for the patent has been refused by the Board of Appeals.

■ If the notice of appeal, with reasons, is not filed with the Commissioner of Patents until after the forty days, the C.C.P.A. obtains no jurisdiction over the matter. In re Retail Clerks International Protective Ass'n, Cust. & Pat. App., 108 F.2d 1008. But if the defeated applicant files with the Commissioner of Patents a notice of appeal, with reasons, to the C.C.P.A. within the forty-day period, the subject matter of the appeal is transferred to the C.C.P.A. and the Commissioner cannot then exercise jurisdiction even to the extent of deciding a pending motion to reconsider the decision appealed from. In re Allen, Cust. & Pat. App., 115 F.2d 936.

■ The equity suit under R.S. § 4915 is a trial de novo. The applicant may strengthen his case, and so may the Commissioner, by the introduction of new matter and they may use parts of the record before the Board of Appeals. Cothran v. Coe, D.C.D.C., 38 F.Supp. 984; New Wrinkle v. Coe, D.C.D.C. 31 F.Supp. 415. In determining which remedy he should elect, the main question posed to a defeated applicant for a patent whose claims have been rejected by the Board of Appeals, is this—is he satisfied with the record made in the Patent Office proceeding? If he is, then the proper course would be to appeal to the C.C.P.A. on that record. If he wishes to supplement the record by new matter, then he should bring a suit in equity under R.S. § 4915. New Wrinkle v. Coe, supra. I do not exclude the possibility

that for some reason an applicant may wish to avoid an appeal to the C.C.P.A. and seek relief in another court. It may be that in the Meyer matter counsel for the applicants, after appealing to the C.C.P.A., decided that it might be inadvisable to go before the very court that had decided the Zecher case [70 F.2d 270, 21 C.C.P.A. (Patents) 1041] on which the Examiner and the Board of Appeals had based their decision rejecting the Meyer claims. But the applicants should have thought of that before they filed their notice of appeal to the C.C.P.A. It was then too late to change their legal strategy.

The election to appeal to the Court of Customs and Patent Appeals under R.S. § 4911, when once made is final, and precludes the later maintenance of a bill in equity under R.S. § 4915. The Meyer applicants could not as a matter of right withdraw the notice of appeal to the C.C.P.A. Walther v. Vanderveer, 64 F.2d 540, 20 C.C.P.A. (Patents) 922. Bakelite Corporation v. National Aniline & Chemical Co., 2 Cir., 83 F.2d 176; Jensen v. Lorenz, 68 App.D.C. 39, 92 F.2d 992; Gams v. Coe, 70 App.D.C. 167, 105 F.2d 46; Hemphill Co. v. Coe, 74 App.D.C. 123, 121 F.2d 897; Chase v. Coe, 74 App.D.C. 152, 122 F.2d 198. For the legislative history and purpose of R.S. § 4911 and § 4915, see Hygienic Products Co. v. Coe, 66 App.D.C. 98, 85 F.2d 264 and Wettlaufer v. Robins, 2 Cir., 92 F.2d 573.

That the filing of the notice of appeal with the Commissioner of Patents on February 1, 1935, setting forth the grounds of the appeal, constituted a pending appeal to the C.C.P.A. is clear from a reading of the Jensen case (supra). No order was sought from the C.C.P.A. dismissing the appeal on consent. There is nothing in the statute, in the Rules of the C.C.P.A. or in the Rules of the Patent Office, 35 U.S.C.A.Appendix that suggests that the Commissioner possessed the power to terminate the appeal by receiving and recognizing the applicants' notice that the appeal was withdrawn. But in May 1935, and prior thereto, it was the practice of the Commissioner to do so, on the assumption that the appeal was not actually pending until the applicant filed in the C.C.P.A. a petition for a hearing of the appeal. This will be discussed more at length later.

The appeal to the C.C.P.A. is brought on for a hearing and determination by a "petition" addressed to the Court. Under Rule XXV of the C.C.P.A. the petition must be filed in the office of the Clerk of the Court. The petition should set forth briefly that the appellant has complied with the statute entitling him to appeal (i. e. 35 U.S.C.A. § 60 and § 61 relating to the filing of the notice of appeal with the Commissioner and the submission to the C.C.P.A. of certified copies of the record in the case) and ask "that his appeal may be heard upon and for the reasons assigned therefor to the commissioner." The "petition" above referred to is not a prerequisite to the taking of the appeal. It serves to bring on for a hearing the appeal already taken. Jensen v. Lorenz, supra.

As a general practice in appeals from one court to another, the appeal may be dismissed only in the manner provided by statute or by the Rules of the Appellate Court. U. S. ex rel. White v. Coe, 68 App. D.C. 218, 95 F.2d 347; Galena Mfg. Co. v. Superior Oil Works, 104 F.2d 400, 26 C.C.P.A. (Patents) 1301. The Commissioner lacked the authority to dismiss the Meyer appeal to the C.C.P.A. The appeal was therefore still pending when the Meyer applicants and their assignee, Electrons, Inc., filed the equity suit in the Supreme Court of the District of Columbia on May 2, 1935 under R.S. § 4915. Even if an order of the C.C.P.A. had been entered dismissing the appeal, I do not believe that the applicants would then have had the right to institute the equity suit. The waiver provision of the statute would bar any such suit.

A defense based on the unlawful issuance of a patent in suit is available to an infringer. If the Commissioner of Patents "under a misconception of the law, has exceeded his authority in granting or reissuing a patent, there is no sound principle to prevent a party sued for its infringement from availing himself of the illegality, independently of any statutory permission so to do." Mahn v. Harwood, 112 U.S. 354 at page 358, 5 S.Ct. 174, 177, 6 S.Ct. 451, 28 L.Ed. 665. But was the action of the Commissioner in issuing the patent in compliance with the final decree in the equity suit unlawful?

R.S. § 4915 provides that "such adjudication [in the equity suit to obtain a patent], if it be in favor of the right of the applicant, shall authorize the commissioner to issue such patent on the applicant filing in the Patent Office a copy of the adjudication

and otherwise complying with the requirements of law." A certified copy of the decree of the lower court entered September 10, 1938, on the mandate of the appellate court, was the adjudication filed in the Patent Office; and the File Wrapper shows that thereafter the Commissioner of Patents complied with that adjudication. "It (the decree in the equity suit) becomes the decision of the Patent Office, and is to govern the action of the Commissioner." Cleveland Trust Co. v. Berry, 6 Cir., 99 F.2d 517 at page 521. It is a fair inference that except for the court decree the Commissioner would have followed the decision of the Board of Appeals which had sustained the Examiner in disallowing certain claims.

▇ Defendant argues that the issuance of the patent was unlawful because the District Court in the equity suit had no jurisdiction and its decree was a nullity. Taking the decree at its face value, the Commissioner of Patents acted lawfully in issuing the patent. The defendant may not in this present action attack collaterally the decree of the court that tried the equity suit under R.S. § 4915, for reasons which I shall now discuss.

▇ The Supreme Court of the District of Columbia (its name was changed to "district court of the United States for the District of Columbia" by the Act of June 25, 1936, 49 Stat. 1921) was "a court of the United States" and the Justices thereof were vested with the power and jurisdiction of judges of the District Courts of the United States. Federal Trade Commission v. Klesner, 274 U.S. 145, 47 S.Ct. 557, 71 L.Ed. 972; Benson v. Hinkel, 198 U.S. 1, 6, 25 S.Ct. 569, 49 L.Ed. 919; O'Donoghue v. United States, 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356; Moss v. United States, 23 App.D.C. 475. Specific reference to its jurisdiction of "actions, suits, controversies, and cases, as well in equity as at law, arising under the copyright and patent laws" and in cases under Title 35 U.S.C.A. § 63 is found in the District of Columbia Code, 1940 Edition, page 263, § 11—307. See, also, Michigan Tool Co. v. Drummond, D.C.D.C., 33 F.Supp. 540.

The Supreme Court of the District of Columbia had jurisdiction over suits under R.S. § 4915, 35 U.S.C.A. § 63. It had jurisdiction of the subject matter of the suit. Its process, sued out by plaintiff and served on the Commissioner in Washington, D. C., gave the court jurisdiction over the parties. If it had been shown to the court that the plaintiffs were under the legal disability of having waived their rights to sue under R.S. § 4915, having filed a notice of appeal to the C.C.P.A., that would have been a good reason for dismissing the complaint. But the complaint alleged that the bill was filed "in accordance with the provisions of Section 4915 of the Revised Statutes of the United States" and the answer of the Commissioner of Patents admitted "the allegations of jurisdiction under Section 4915 R.S., 35 U.S.C.A. § 63, as amended." The trial court made a Finding that the suit was "brought under the provision of Section 4915 R.S."

▇ One of the exhibits before the trial court in the equity suit was the File Wrapper on the Meyer application which contained the applicant's notice of appeal dated January 31, 1935 to the C.C.P.A. and the notice of the withdrawal of the appeal filed with the Commissioner on May 2, 1935. True, there was no issue raised before the trial court or the appellate court on the question of plaintiff's waiver of the right to bring the equity suit. But the issue might have been raised therein and judicially determined. The judgment of the court like any other judgment would be binding on the Commissioner in any other action to enforce the judgment, not only as to issues raised and judicially determined but as to any other issue that the Commissioner could have raised. If the judgment of the trial court was erroneous for any reason, including the right of plaintiffs to bring the suit, the Commissioner could have called that error to the attention of the appellate courts that had jurisdiction to review the judgment of the trial court. But if he did not thus raise the error by appeal, he could not later assert, in the absence of any fraud or collusion in the procurement of the judgment, that he was not bound by the judgment. If the Commissioner himself was thus bound, it follows that no third party could attack the judgment collaterally and seek indirectly to invalidate the acts of the Commissioner in issuing the patent pursuant to the final decree in the equity suit.

In Chicot County Dist. v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 319, 84 L.Ed. 329, Chief Justice Hughes delivered the opinion of the court. He wrote:

502

"The argument is pressed that the District Court was sitting as a court of bankruptcy, with the limited jurisdiction conferred by statute, and that, as the statute was later declared to be invalid, the District Court was without jurisdiction to entertain the proceeding and hence its decree is open to collateral attack. We think the argument untenable. The lower federal courts are all courts of limited jurisdiction, that is, with only the jurisdiction which Congress has prescribed. But none the less they are courts with authority, when parties are brought before them in accordance with the requirements of due process, to determine whether or not they have jurisdiction to entertain the cause and for this purpose to construe and apply the statute under which they are asked to act. Their determinations of such questions, while open to direct review, may not be assailed collaterally."

The Chief Justice referred to the case of McCormick v. Sullivant, 10 Wheat. 192, 6 L.Ed. 300, and quoted from it the following: "If the jurisdiction (based on diversity of citizenship) be not alleged in the proceedings, their judgments and decrees are erroneous, and may, upon a writ of error or appeal, be reversed for that cause. But they are not absolute nullities." He also stated "whatever the contention as to jurisdiction may be, whether it is that the boundaries of a valid statute have been transgressed, or that the statute itself is invalid, the question of jurisdiction is still one for judicial determination. * * * The court has the authority to pass upon its own jurisdiction and its decree sustaining jurisdiction against attack, while open to direct review, is res judicata in a collateral action. Stoll v. Gottlieb, 305 U.S. 165, 171, 172, 59 S.Ct. 134, 137, 83 L.Ed. 104."

The Chief Justice also delivered the opinion in Jackson v. Irving Trust Co., 311 U.S. 494, 61 S.Ct. 326, 330, 85 L.Ed. 297. In that case, the Attorney General moved upon affidavits to set aside a 1929 decree of a District Court, under § 9(a) of the Trading With the Enemy Act, 50 U.S.C.A.Appendix, § 9(a), directing payment to certain claimants of a stated amount out of property of a German corporation which had been seized by the Alien Property Custodian. The amount awarded in the first suit had been paid. The Attorney General, in the second proceeding in 1938, contended that the District

Court that rendered the 1929 decree was without jurisdiction, because the beneficial owner of the claim was an "enemy" as defined by the Act and was not entitled to sue under the Act. The following is quoted from the opinion of the Chief Justice:

"By the provisions of that Act the jurisdiction of the District Court attached when the suit was brought upon the claim which the plaintiffs as non-enemy claimants set forth. However the issues were labeled the court was authorized to determine them. Texas & Pacific R. Co. v. Gulf, C. & S. F. R. Co., 270 U.S. 266, 274, 46 S.Ct. 263, 265, 70 L.Ed. 578; Stoll v. Gottlieb, supra, 305 US. [165] page 171, 59 S.Ct. [134], 83 L.Ed. 104. And whether a particular issue was actually litigated is immaterial in view of the necessary conclusion that there was full opportunity to litigate it and that it was adjudicated by the decree. Cromwell v. County of Sac, 94 U.S. 351, 352, 24 L.Ed. 195; Grubb v. Public Utilities Commission, 281 U.S. 470, 479, 50 S.Ct. 374, 378, 74 L.Ed. 972; Chicot County Drainage District v. Baxter State Bank, supra; Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 403, 60 S.Ct. 907, 917, 84 L.Ed. 1263. If the District Court had erred in dealing, or in failing to deal, with any issue thus involved, the remedy was by appeal and no appeal was taken."

In commenting on the Jackson case, the Circuit Court of Appeals, Second Circuit, in United States v. Rodiek, 2 Cir., 117 F.2d 588, 591, remarked that the Jackson decision "turns on the application of ordinary principles of res judicata."

In the equity suit brought by the Meyer applicants and their assignee, Electrons, Inc., against Coe, the Commissioner of Patents, the plaintiffs alleged that the suit was brought under R.S. § 4915, that the claims of their patent application had been rejected by the Primary Examiner; that the applicants appealed from his decision to the Board of Appeals who affirmed the Examiner September 18, 1934; that a rehearing was granted and subsequently a further hearing was had before the Board of Appeals and the said Board on December 28, 1934 reaffirmed its decision of September 18, 1934. On the Bill of Complaint as filed in the Supreme Court for the District of Columbia it appeared that plaintiff came within the statute and as a defeated applicant had the right to bring the suit under R.S. § 4915. True, there was no allegation that no appeal had

been taken from the decision of the Board of Appeals, because the notice of appeal to the C.C.P.A. had been withdrawn. Whether or not that was an essential allegation of the Bill of Complaint or a matter of defense to be pleaded in the answer need not be decided, because on what was pleaded in the complaint it appeared that the trial court had jurisdiction and the answer expressly conceded the jurisdiction of the court. It is my opinion, however, that applicants' "waiver" of their right to bring the equity suit was a matter of defense, to be pleaded in the answer or raised on motion to dismiss. The statute gave the defeated applicants an election of remedies. Ordinarily, one having an election of co-existing inconsistent remedies, who makes an election and indicates his choice is bound thereby; but "the defense of election of remedies must be pleaded in order to be available." See, Hertz v. Mills, D.C., 10 F.Supp. 979 at page 981 and authorities there cited.

The case at bar was reopened in December 1943 for the purpose of receiving additional exhibits, including the deposition of Theodore A. Hostetler, who was Solicitor for the Patent Office in May 1935. They all related to the practice prevailing in the Patent Office at that time in respect to the withdrawal of notices of appeal to the C.C.P.A., filed by a defeated applicant with the Commissioner of Patents from a decision of the Board of Appeals of the Patent Office. The evidence, as I see it, concerns the good faith of the Commissioner and his assistants in permitting the withdrawal of the notice of appeal to the C.C.P.A. and in appearing in the suit brought against him in the Supreme Court for the District of Columbia and in admitting the jurisdictional allegations of the complaint of Electrons, Inc. in that court. While I did not believe there could have been any fraud or collusion in their conduct, I felt that the record in the present case should affirmatively show that what was done in the Electrons, Inc., suit against the Commissioner was in accordance with the practice then prevailing in the Patent Office. That has now been clearly established by the additional evidence thus received (Exs. 66, 67 and 68), so that it can be stated that the decree in the Electrons case was not tainted by any fraud or collusion and is not subject to collateral attack under the decision in Chicot County Dist. v. Baxter State Bank, supra, and Jackson v. Irving Trust Co., supra.

### The Meyer-Buttolph Interference Proceeding

An interference proceeding involving claim 55 of the Meyer application and claim 56 of an application for Vapor Arc Lamps filed by LeRoy J. Buttolph (whose assignee was General Electric Vapor Lamp Co.) was declared by the Examiner on October 12, 1938. (Claim 55 of the Meyer application became claim 6 of the Meyer patent #2,182,732 when issued.) The interference resulted favorably for the Meyer application October 11, 1939, due to a concession of priority (Ex. 56) filed by Buttolph's attorney October 9, 1939, to which the General Electric Company affixed its consent.

Buttolph's concession of priority was made because Buttolph was informed and believed that his original application did not disclose the subject matter of certain claims specified in the concession. In filing the concession of priority, Buttolph's attorney wrote:

"Since the declaration of this interference the Meyer, et al application has been assigned to the General Electric Company, which is also the owner of the Buttolph application. However, the acquisition of the Meyer, et al application by General Electric Company was subject to certain outstanding license rights, so that others than the General Electric Company have an interest in the outcome of this interference. Because of that fact, after the acquisition by the General Electric Company, the attorneys who had theretofore represented Meyer, et al in this interference were asked to continue that representation. In so doing, they filed the motion to dissolve referred to above. Since the filing of that motion, counsel for the General Electric Company have made a careful study of the Buttolph application in the light of the state of the art as of the date of its filing, and have concluded that that disclosure does not afford an adequate basis either for the original count of the interference or for the claims sought to be added under Buttolph's pending motions, whereas the Meyer, et al application does afford such a basis. Accordingly, in order that the patent may issue to the actual inventors of the subject matter of the counts in controversy, the enclosed concession of priority by Buttolph is filed."

Defendant argues that General Electric Company is bound absolutely in this present action by an assertion of prior-

ity (Ex.CCC) made by its employee Buttolph when he was contesting that issue with Meyer in the interference proceeding. However, that is only one piece of evidence. The court must consider the entire record made in this trial on the issue of priority. I am satisfied that Meyer was entitled to priority.

True, General Electric purchased the Meyer application while the interference proceeding was pending. But General Electric paid $180,000 for it. It is reasonable to conclude that they would not have paid that large sum of money if they had thought that Buttolph could succeed on the priority issue. Further, before the trial of this case, the defendant's attorneys sought to take the testimony of Buttolph and to examine his records. Their request was granted. After spending a day going over the Buttolph records with their own experts, defendant's attorneys did not take Buttolph's testimony. At the trial they offered nothing on that point except Buttolph's oath in the interference proceeding in which he had asserted priority over Meyer. An admission against interest may be explained. The court then determines the probative value of the admission in the light of the explanation; and on all the evidence, including the admission, decides the issue to which it relates, in this case the question of priority as between Meyer and Buttolph.

### Alleged Indefiniteness of the Meyer Patent

Defendant asserts that the specification, drawings and claims, all together, fail to disclose details of how the lamp could be constructed by one skilled in the art—that the disclosures of the patent are vague and meaningless and fail to comply with R.S. § 4888.

This patent is for a device—a metal vapor lamp. The statute (R.S. § 4888, Tit. 35 U.S.C.A. § 33) requires that the application for the patent shall contain a written description of the invention or discovery, and "of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same." As stated in Permutit v. Graver Corporation, 284 U.S. 52 at page 60, 52 S.Ct. 53, at page 55, 75 L.Ed. 1429:

"The statute requires the patentee not only to explain the principle of his apparatus and to describe it in such terms that any person skilled in the art to which it appertains may construct and use it after the expiration of the patent, but also to inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not."

See, also, General Electric Co. v. Wabash Co., 304 U.S. 364 at pages 368 and 369, 58 S.Ct. 899, 82 L.Ed. 1402.

One essential particular in which the patent is alleged to be devoid of any definite or helpful statement or explanation is the pressure of the argon gas and of the mercury vapor. There is no statement that the pressure of either shall be any specified number or range of microns or millimeters. Plaintiffs say the requirements of the statute are met by the reference in the third paragraph of the specification to "an argon or neon filled tube, such as is in general use for the purposes of advertising, with an admixture of metal vapor, for instance mercury vapor, to the gas in the tube." That point was argued in the patent office.

[The decision of the Court of Appeals for the District of Columbia in the Electrons, Inc. case, 69 App.D.C. 181, 99 F.2d 414, did not consider the question of the alleged indefiniteness of the claims. That the point was not argued or considered by it in the Electrons, Inc. case is pointed out by the same Court in Koebel v. Coe, 70 App. D.C. 261, 105 F.2d 784 at page 785.]

The applicant's attorneys in their "Remarks" appended to the amendments requested August 3, 1933, argued that "the art was already familiar with these advertising signs, and this instruction was equivalent to saying to employ the gas pressures used in the well-known blue, argon or neon sign tubes in which pressures from 1 to 8 mm. depending on the molecular weight of the rare gas or the mean free path of the electrons in the composite gas atmosphere were employed."

The patent office action, November 2, 1933, rejected certain of the claims (one of them was 55 which later became claim 6 of the patent as issued) "on the ground of new matter," stating that "No basis is found in this application as filed for some or all of the following statements appearing in

these claims: (1) that the gaseous atmosphere is at a low pressure."

That contention of the Examiner was completely and convincingly answered by an affidavit of an expert, Carl J. R. H. von Wedel, sworn to December 19, 1933. He knew the applicants and had been associated with them in the Rectron Company, Berlin, Germany, of which von Wedel was the technical manager. He describes certain combined gas and metal vapor lamps for high capacity made by the applicants prior to the filing date (December 1927). "The lamp envelope consisted of a straight tube of glass, pervious to the desired rays, about 50 c.m. (20 inches) long and about 18 mm. (¾ inch) diameter, in some instances having an enlargement at each end. The electrodes were mounted on stems and sealed in opposite ends of the tube, at least one electrode being a Wehnelt-type cathode. For an alternating current lamp two such cathodes were provided, and they were arranged to be heated either by passing current therethrough or by means of auxiliary starting electrodes and the operating discharge." The tube contained "argon gas at about two millimeters (Hg) pressure, * * * and a small drop of mercury was distilled into the tube." He says that "Some of these lamps were operated successfully, for everal months" and prior to the aforementioned filing date. They operated "on both alternating and direct current of about 1.5 amperes at 220 volts, and produce an intense blue light, characteristic of mercury vapor, which was uniform for the whole length of the tube."

In operation—"The light first emitted had the pale, greenish color of argon but as the lamp heated up this changed to the blue light of mercury." Von Wedel then explains "A lamp like those above mentioned but having only mercury vapor without the gas filling, would neither start nor operate on alternating current at room temperature * * *. The provision of a low pressure inert gas in addition to the mercury vapor in such a lamp and the preliminary discharge through the gas permitted an equivalent increase in the mercury vapor density (to what it would be at about 70° C) throughout the discharge path when the lamp was in an ordinary room or outdoors." He also explained what was understood in the art by the term glow current and what the pressure of inert gas was in advertising sign tubes. He said "The pressure of inert gas required to give the

radiation of mercury in such tubes was known to be limited and different for different gases, and it was also known what pressure to use for a given gas in a tube of given dimensions. These pressures were all low, however, ranging from 1 to 8 mm. (Hg) for the gases ordinarily used, such as argon or neon. I do not know of any tube similar to such blue sign tubes which use or could use the relatively high pressure gas fillings of tungsten-arc devices, namely, from a few centimeters to atmospheric pressure."

The Examiner was of the opinion that a person, skilled in the art of making a device in accordance with the application as filed and making the same, would not *necessarily* provide the device with a gaseous atmosphere at low pressure. He held that the specification is silent as to (a) envelope dimension, (b) gas pressure, (c) operating current and voltage. (Office action of January 20, 1934.)

An appeal was taken to the Board of Appeals. That Board expressed the view "that while the original specification is not as clear and definite in this matter as it could be, yet the rejection of these claims as involving new matter is not warranted". (See its opinion of March 28, 1934.)

The pressure of the neon gas in the neon advertising tube has been mentioned in several decided cases. It is referred to as "7.3 mm." in Bellows-Claude Neon Co. v. Sun Ray Gas Corporation, D.C., 39 F.2d 907 at page 911, as "7 to 8 mil. of mercury" in Rainbow Light v. Claude Neon Lights, 2 Cir., 40 F.2d 222 at page 223; and as "of the nature of a millimeter of mercury" in Electrical Products Corporation v. Neale, Inc., D.C., 48 F.2d 824 at page 827.

To escape the conclusion that the reference in the Meyer specification to the argon or neon filled tube in general use for advertising purposes would indicate that the pressure of the inert gas would be the same in the Meyer tube as in those tubes (2 to 10 millimeters) defendant offered at the trial testimony of its experts to the effect that Meyer's reference was not to advertising tubes but to the glim or glow lamps (Exs. N to N-4) in which the pressure of the inert gas was about 30 millimeters. However, Meyer was referring to *tubes* and I believe he meant the neon advertising tubes in which the average pressure is 7 or 8 millimeters. I think that von Wedel's affidavit removes any shadow of a doubt about it.

In like manner his affidavit meets another criticism that there is no disclosure in the specification to show that the discharge would first take place through the argon, until the mercury vapor pressure increased to a point where it would become ionized and excited and would become the main source of emitted rays. The answer is that the lamp would be bound to start that way, because of the known difference between the pressure of the argon gas and that of the mercury vapor coming from the mercury globule. When cold the pressure of mercury is extremely low. However, once the heat generated by the discharge through the argon gas vaporizes more mercury from the globule, the mercury pressure is built up and the stream of electrons from cathode to anode ionizes some of the mercury atoms and excites others. The ionization voltage of mercury vapor (10.4 volts) is lower than that of argon (15.8 volts); the excitation voltage of mercury is 4.9 volts which is lower than that of argon (11.5 volts). Thus, when the mercury vapor is increased by the heat of the lamp in operation, it follows that the mercury vapor becomes the main source of emitted rays. The mercury vapor atoms, excited, emit ultra-violet rays copiously but argon is a poor emitter of these rays. That would be known to one skilled in the art. It is not necessary that the specification of a patent should explain every term and reference used if their meaning would be known to one skilled in the art.

### Alleged "New Matter" in Meyer et al. Patent Claims as Issued

One of the defendant's contentions is that claims 25 and 27 of the Meyer patent are invalid because they refer to the luminous discharge column, between the main discharge electrodes, as being "defined by the vessel wall." The basis of the claimed invalidity is the alleged lack of any disclosure or recital in the specification that would justify the use of that language in the patent claims. The discharge in the Meyer lamp would be of the positive column type due to the discharge passing through the argon-mercury vapor mixture in the tube. The positive column would fill the tube and so would be defined or limited by the vessel wall. This would be inherent in the lamp operating with those gas mixtures, using Wehnelt cathodes at each end of the tube and ordinary 110 or 220 volt A. C. household current.

The samples of General Electric fluorescent lamps shown at the trial, had a luminous discharge defined by the vessel wall, i.e. filling the tube right to its walls. Defendant argues that Exhibit F, a General Electric high pressure mercury vapor lamp, has a highly constricted discharge which does not extend to the walls of the tube; that the paper wrapper of the lamp when sold lists a number of patents including #2,-182,732, the number of the Meyer patent in suit; and that therefore the Meyer patent relates solely to a type of lamp in which the discharge does not extend to the walls of the tube. The conclusion is a non sequitur. Rather, we should say that it shows that General Electric felt that at least some of the invention of Meyer was embodied in the General Electric high pressure mercury lamp.

Reference is also made by defendant to a method of starting the lamp (by an inductive kick) mentioned in the Meyer specification, "if current of higher voltage is used." Even if that be true, and a lamp operating on a higher voltage is also referred to, nevertheless the specification clearly includes a lamp that will operate on the ordinary voltage of 120-220 A.C. current, owing to the presence in the tube of a rare gas besides the metal vapor.

The specification does not state in any place that the discharge will be a constricted discharge. Certain claims 49 to 52 which had been added by amendment of October 11, 1932, were amended August 3, 1933 to substitute the words "of the order of the discharge in a mercury vapor arc lamp" in place of the expression "substantially without cathode drop" in referring to the discharge through the rare gas. The claims had been rejected "on the ground of new matter" on February 17, 1933. At the time of the amendment of claims 49 to 52 on August 3, 1933, the applicants added two new claims, 53 and 54 in which reference is made to "two fixed main discharge electrodes spaced apart and forming with the walls of said vessel an elongated discharge path therein." These two new claims 53 and 54 made no reference to any discharge "of the order of the discharge in a mercury vapor arc lamp." On October 25, 1933 two new claims 55 and 56 used the expression "of the order of the discharge in a mercury vapor arc lamp." All of the claims 49 to 56 were rejected by office action November 2, 1933. The claims were

again rejected June 20, 1934 and one ground for rejecting claims 49-52, 55 and 56 was that they contained new matter which the Examiner set forth in three subdivisions of which the second was "That the rare or inert gas is adapted to support a heavy current discharge of the order of the discharge in a mercury vapor lamp." Claims 55 and 56 referred to "A metal vapor lamp comprising a vessel adapted to provide a discharge path defined by the walls of said vessel." There followed further amendments on January 31, 1934 by which the expression "of the order of the discharge in a mercury vapor arc lamp" was cancelled from claims 49 to 51 (claim 52 was cancelled altogether) and from 55 and 56. On the same date a new claim 57 which referred to the electrodes as being "spaced apart in said vessel to form therebetween a luminous discharge column defined by the vessel wall." Evidently the expression "defined by the vessel wall" met with the Examiner's approval because he did not refer to it as a reason for the rejection of the claims in which it appeared, and after the Board of Appeals overruled the Examiner and sustained all claims on March 28, 1934, the Examiner suggested a claim for an interference proceeding (which applicants adopted as claim 58) in which the discharge between the electrodes is stated to be a "luminous discharge column defined by the vessel wall."

Thus there does not seem to be any question about its favorable consideration in the Patent Office and later in the Court of Appeals for the District of Columbia. It was intended to distinguish the Meyer lamp from that of a patent to one Friederich #1,422,553 of July 11, 1922, for a mercury arc lamp, which had been cited by the Examiner against the Meyer applicants in his Patent Office Action May 29, 1930, June 30, 1931, June 23, 1932, and February 17, 1933. The Meyer applicants had included in certain of the claims, in referring to the low voltage gaseous discharge in the lamp, an expression—"of the order of the discharge in a mercury vapor arc lamp," in claims 55 and 56 when first submitted. There was some question as to whether this meant a constricted arc. To distinguish Meyer's application from the Friederich patent and to indicate clearly that the positive column of the discharge filled the entire tube, the expression was added "defined by the vessel wall" thus showing the type of the gaseous discharge between the two electrodes.

Defendant's argument against this direction about the "discharge being defined by the vessel wall" is used as the basis for a further contention that the Meyer patent relates to a high capacity lamp which was the same as the old high pressure mercury lamp, except that hot or Wehnelt cathodes have been substituted for cold cathodes, which defendant claims would not constitute invention. Defendant's expert referred to this as the second form of device mentioned in the patent—a high capacity lamp. The old quartz mercury lamp was a high capacity lamp with no inert gas—only the mercury vapor. Lamps that had a combination of an inert gas and mercury vapor and a cold cathode (such as the Claude neon lamp) would operate on a very high voltage. The Meyer patent may be broad enough to cover also a high capacity mercury vapor lamp "which can be ignited easily without requiring a high voltage if hot cathodes are used," but that is not an issue in this case.

The specification taught that the Meyer lamp could be operated with alternating current and connected directly with any house lighting system. Claims 6 and 13 in suit refer to a lamp with "a low voltage gaseous discharge." Meyer disclosed the essential features and mode of construction of a new low voltage ultra-violet lamp. That is the type of lamp, plus the luminescent material, involved in this litigation.

As a further ground for the alleged invalidity of certain claims of the Meyer patent defendant argues that they contain matter which was not referred to in the specification or claims as originally filed; that this matter was added by the applicant's attorneys; that Meyer never made oath that he considered this new matter as any part of his disclosures or contribution; that the claims containing such alleged new matter do not meet the requirement of R.S. § 4892, 35 U.S.C.A. § 35, requiring the applicant to make oath that he believes himself to be the original and first inventor.

The oath covers what is either described or claimed in the original application. "Supplemental oath is required only when an applicant claims some phase of the invention quite different from what was originally claimed." Glade v. Walgreen Co., 7 Cir., 122 F.2d 306 at page 311.

The amendments and the original specification and claims "are directed to the same general subject matter," in the case of the Meyer patent.

Defendant cites Steward v. American Lava Co., 215 U.S. 161, 30 S.Ct. 46, 54 L.Ed. 139, where the Court referred to the fact that the applicant might have found it difficult to take the oath as to the amendment. That was an extreme case where the applicant had testified at the trial. In discussing the fourth claim of the patent Mr. Justice Holmes wrote: "The theory was not that upon which Dolan (the applicant) was working, or in which he even now believes. He was a witness in the case, and testified that it was his lawyer's contrivance, and while, of course, a mechanical device may be patentable although the true theory of it is not understood, here the words relied upon to show that the cylinder was to have this characteristic shortness also were the insertion of the lawyer, and would have had little importance apart from that newly adopted point of view." 215 U.S. at page 166, 30 S.Ct. at page 49, 54 L.Ed. 139.

### Prior Art Cited Against the Meyer Application

#### The Kruh Patent No. 1,032,914 Issued July 16, 1912

I agree with the decision of the District Court of Appeals that the claims of the Meyer application then before the Court were for a patentable invention over the George and Kruh patents, whether taken together or considered separately.

Defendant's counsel argues that the Kruh patent shows that it was well known in the art as early as 1906, when the Kruh application was filed, that the electrodes are spaced apart a substantial distance in lamps, whereas in rectifiers they are usually close together. Figure 1 of the Kruh drawings shows the electrodes, the helix (a cathode) and the main anode substantially apart and the current between the two, according to the specifications "fills the tube with a brilliant illumination taking place through the mercury vapor * * * like that of the well-known mercury arc lamp" without any flickering. (An auxiliary anode is also shown.) In Figure 2, "The rectifier tube," the two anodes and the helix are fairly close together. From that defendant concludes that the same principles are used in rectifiers and lamps. Assuming that to be true in the case of a mercury lamp, it

does not show lack of invention in the Meyer patent.

#### The French Patent to Risler No. 607,650 Issued April 3, 1926

The Examiner had cited the French patent to Risler as part of the prior art, on his first rejection of the Meyer claims from which the applicants took their first appeal to the Board of Appeals February 9, 1934. He discussed the Risler patent in considerable detail in his Statement submitted to the Board of Appeals February 19, 1934. The Board of Appeals in its opinion of March 29, 1934, reversing the Examiner, reviewed the rather indefinite statements in the Risler patent, the Examiner's arguments based on that patent, and the applicant's refutation thereof. The Board of Appeals then stated:

"As we view the rejection appellants have presented a description of a spectral ray lamp for the emission of ultra-violet rays, of a certain definite character having certain stated advantages and it seems to us as a fair anticipation of claims of this type a clear disclosure in the French patent is necessary, and this we fail to find. We note that certain claims refer to the pressure conditions within the evacuated envelope and the fact that a low voltage discharge is called for. The French patent is very vague and general in this connection. We are not satisfied that the French patentee had the problem here presented nor solved it in the manner recited in the rejected claims."

When the matter was re-referred to the Examiner on his request dated July 10, 1934 approved by the Assistant Commissioner on said date, for the purpose of rejecting all the claims on the Kruh patent No. 1,032,914 and the George patent #1,-671,109 for reasons given by the C.C.P.A. in its decision of April 16, 1934 in the Zecher case [70 F.2d 270, 21 C.C.P.A. (Patents) 1041], the Examiner did not again mention the Risler patent. The Examiner in his statement on this second rejection urged the Kruh and George references. The Board of Appeals, relying on the decision in the Zecher case (which did not consider the Risler patent) held the applicant's claims unpatentable in an opinion dated September 18, 1934, and adhered to that decision on a petition for a rehearing December 28, 1934. The Risler patent was not discussed in the opinion of the District Court of Appeals in the

Electrons case [69 App.D.C. 181, 99 F.2d 414]. The Court said that the sole question before it was "whether or not the disclosure of the Meyer application constitutes invention over the references cited by the Commissioner, particularly Kruh and George.

A reading of the Risler patent shows that the mercury vapor was not an essential part of its gaseous combinations, some of which omit the mercury altogether. I agree with the opinion of the Board of Appeals (March 28, 1934) rejecting the Risler patent as anticipating Meyer.

### French Scientific Articles Published in July 1923 and Late 1925

The Risler French patent No. 607,650 (March 1925) and two scientific articles written in July 1923 and November 1925 referring to Risler's work, are part of Exhibit V.

One of the scientific articles is a lecture by Mr. Risler in July 1923 before the French Society of Electricians on certain studies he had made concerning "fluorescence actions as well as the radiations that are favorable for their production." He referred to "the development of fluorescence actions in the violet and the ultra violet region." He also stated that "A given fluorescent body or material will always give us the same spectrum" and that "X-rays, radiation of radium, blue rays, violet rays produced by different energy sources are able to give rise to absolutely identical actions." In discussing the formation of the fluorescent tube he stated that it would "behave exactly like a radiation transformer or transducer."

"To utilize the fluorescent property of radiation of short wave-length it is there-necessary to bring the substance in direct contact with these radiations" and he tells how he therefore spread zinc sulfide on the outside of the tube and suggested that it could readily be incorporated in the glass paste. He speaks of a fluorescent tube and the manner in which it could be made "to correct light sources of selected radiations", stating that the Moore tube (nitrogen) and the neon-mercury tube would have their luminosity increased "if a fluorescent film were added."

As to the current—he recommended the use of "the high potential high-frequency combination." Concerning the tube he said —"As this opaque tube will only transmit the actinic actions of ultraviolet, exciters of zinc sulfide will give rise to a new form of illumination that is absolutely harmless from the viewpoint of the retina. Our sulfide, in this case, plays the part of a transformer of light and of wave-length, thus rendering perfectly inoffensive radiations that originally were dangerous." This probably referred to a tube of the quartz or uviol glass type with the sulfide on the outside.

There is nothing in the article on the pressure of the gas vapors in the tube. The cathode used was of the cold cathode type, definitely undesirable in a Meyer type lamp. As a scientific lecture the article is interesting, but it deals only with experiments and contains no teaching from which one skilled in the art could gather the elements requisite for a practical operative ultra-violet or fluorescent lamp and no teaching of how those elements should be combined.

The second scientific article in Exhibit V was published in a French scientific magazine in the latter part of 1925. It dealt with the use of luminescent tubes for the illumination of advertising signs. The research work of the American physicist Moore, the French scientist G. Claude and the Risler paper of July 1923 are referred to. The writer compares the electron effect explained by Risler to the phenomenon which occurs inside the mercury-vapor lamp. As to the electrodes he says that the main electrodes consist of molybdenum and the auxiliary electrode of electrolytic copper. "They are of large area or surface in order to avoid gas absorption phenomena inside, a scheme that has already been disclosed by G. Claude in connection with neon tubes." The A. C. feed current has a comparatively high potential, "of an order of magnitude around 1700 V for a tube with sodium salt having a length of 6 meters * * *. The sodium tube consumes about .80 Watt per candle at high potential. The luminous intensity attains around 95 candles for a length of 1 meter." The article also states that in Mr. Risler's further researches he created "a lighting or striking device for all rarefied-gas tubes on low potential comprising a metal filament accommodated inside the tube, this filament being heated by the lighting circuit current." This article does not disclose the combination of elements referred to in the Meyer invention which was designed to operate on the ordinary A.C. current of 110-220 volts.

Defendant cites the original specification (Ex. H-1) of the Smith patent No. 2,201,-817 (Ex. H) as a prior art reference against the Meyer patent. The Smith patent is also the basis of one of defendant's counterclaims and as such it will be discussed later. Smith's objective and result compared with Meyer's were fundamentally different and the means they respectively employed were in many essential respects thoroughly different. Smith's device was designed to be efficient in the transformation of energy and Meyer's was designed to be efficient in giving off ultra-violet light. Smith nowhere in his specification says anything about a lamp or the use of any of his teachings in the production of any kind of light. To aid in the passage of the current Smith suggested the use of a new kind of cathode with a shield (slightly perforated) to build up a gas pressure inside the shield at the cathode many times as great as that outside the cathode shield. Smith did not use the Wehnelt cathode. He describes one of his own design. Its special form of construction was supposed to be an important feature of his invention and to have special advantages when used in Smith's rectifier. Even if oxide coated—that would be nothing new. Meyer used the Wehnelt type cathode, which was well known at the time. Smith's cathode, with its shield and the alleged pumping action connected with the cathode, is not mentioned or used by Meyer.

Defendants argue that the Risler disclosure of the idea of a luminescent or fluorescent lamp when combined with the Smith disclosures (as to the use of an inert gas in a mixture, for starting purposes in an electrical discharge device of the gaseous type) invalidates claims 6, 13, 25 and 27 of the Meyer patent. Assuming, arguendo, that the alleged disclosures were properly attributable to Risler and Smith and were shown by them in separate workable devices, yet neither of them suggested the combination of their respective alleged disclosures and neither of them taught how to produce a workable fluorescent lamp or a workable ultra-violet lamp, operating on the basic principles of the Meyer invention.

The following is quoted from Judge Learned Hand's opinion in Dewey & Almy Chemical Co. v. Mimex Co., 2 Cir., 124 F.2d 986, at page 989:

"No doctrine of the patent law is better established than that a prior patent or other publication to be an anticipation must bear within its four corners adequate directions for the practice of the patent invalidated. If the earlier disclosure offers no more than a starting point for further experiments, if its teaching will sometimes succeed and sometimes fail, if it does not inform the art without more how to practice the new invention, it has not correspondingly enriched the store of common knowledge, and it is not an anticipation."

See the cases cited by Judge Hand in a footnote. at page 989.

Extent of Validity of Meyer Claims in Suit

Claim 25 (added by the amendment of October 31, 1939) is similar to and narrower than claim 9 which was held patentable by the Court of Appeals for the District of Columbia in the Electrons, Inc. case. Claim 9 refers to "a metal vapor lamp" with a filling of rare gas and "metallic vapor"; claim 25 terms the lamp "a mercury vapor lamp" and the filling as a rare gas and "mercury vapor." The "metal vapor lamp" of the Meyer patent includes of course a "mercury vapor lamp." The specification seems to center on the combination of the argon gas and the mercury and their use as the filling in a tube of uviol glass, so that the ultra-violet radiation produced when the mercury vapor is excited by the discharge across the tube from cathode to anode, may be employed for germicidal or therapeutic purposes. Claim 25 is also valid.

Claim 27 is the same as claim 25 except for the addition of the words "and fluorescent material disposed in the path of said spectral ray emission." For reasons herein stated when discussing the addition of the provision as to "luminescent material enclosed in said vessel" in claim 13, I am of the opinion that the words "and fluorescent material disposed in the path of said spectral ray emission" were improperly included in claim 27, but that if said provision is eliminated claim 27 is valid as to the remaining provisions. Claim 13 is also valid if the phrase "luminescent material enclosed in said vessel" is eliminated.

The Meyer specification and claims refer and embody a combination of the elements found in present day fluorescent lamps manufactured by General Electric and by Hygrade—the elongated glass tube—the electrodes at opposite ends of the tube—the special type of electrode of the oxide coated type, such as the Wehnelt cathode—provisions for preheating the cathode in starting—the rare gas, argon—the mercury

vapor—the starting of the lamp through the argon gas—the mercury vapor acting as the main source of the ultra-violet radiation—all in a lamp that operates on the A. C. current of any house lighting system.

A lamp of that type, operating on A. C. household current of low voltage and easily started through the joint use of Wehnelt cathodes and argon gas, with the mercury vapor then taking over as the main medium through which the discharge passes and as, of course, the principal source of the rays emitted by this gaseous combination within the tube—a lamp of that type with all those elements was something new unquestionably. It was "an answer for which the art had been looking." Bresnick v. United States Vitamin Corporation, 2 Cir., 1943, 139 F.2d 239, 241. It involved invention. Although all its component elements had been known to the art for some time prior to the filing of the Meyer application—they never had been so combined to produce cheaply the new and desirable result of an ultra-violet lamp of the Meyer type. The expensive, bulky, complicated, dangerous, high-powered quartz lamp (Ex. 22) used in laboratories and operating on direct current only, was not in the same class as the Meyer lamp. All you have to do is look at the two and be shown how they operate to be firmly convinced of that fact. The disadvantages of the "quartz lamp" are mentioned in the opinion of the United States Court of Appeals for the District of Columbia in the Electrons, Inc. case, 69 App.D.C. 181, 99 F.2d 414.

It had been known prior to Meyer's application that ultra violet rays, falling on certain substances, cause them to fluoresce. With the discovery of a tubular ultra violet lamp, operating on A. C. house current, there would be no invention in using an ordinary glass tube to keep the rays within the tube and coating the tube interiorly with a fluorescent material. Meyer did mention such coatings and that the lamp could then be used with advantage for advertising purposes. But you first had to have the lamp. Conceding that the Meyer applicants abandoned for about eleven years that part of their claims relating to the use of luminescent or fluorescent material, that would not bar them or their successors from establishing infringement of their patent if any one used a lamp of the same interior construction and gaseous filling as their germicidal lamp and coated the tube with fluorescent material.

## Infringement

It requires no further detailed analysis or comparison, and no extensive explanation to show how the construction of the fluorescent lamps of Hygrade (except for the fluorescent coating) infringe claims 6 and 25 of the Meyer patent, and also claims 13 and 27 to the extent they have been held valid. The discussion of the construction of fluorescent lamps and their essential features as set forth in the first part of the opinion and the extensive review I have made herein of the Meyer application, its specification and claims, and its history in the Patent Office and in the Courts, lead to only one conclusion—that the fluorescent lamps made by Hygrade infringe the Meyer patent claims in suit.

### Defendant's Counterclaim on Smith Patent No. 2,201,817

Patent No. 2,201,817 issued to Charles G. Smith (assignor to Raytheon Manufacturing Company) on May 21, 1940, contains 80 claims as issued. The history of the Smith patent application No. 55,262, dated September 9, 1925, as disclosed by the File Wrapper (Ex. 35), is most extraordinary. The specification was so changed and enlarged by amendments in October 1938 and later, that the specification of the patent as issued is practically worthless in this litigation. Defendants' counsel realize this and attempt to build up a case on the Smith patent by showing some basis in the original Smith application (Ex. H.–1) for some of the claims in suit.

Defendants' counterclaim charges that the General Electric fluorescent lamps and ultra-violet germicidal lamps infringe claims 13, 43, 72 to 78 inclusive, and claim 80 of the Smith patent. A study of the File Wrapper (Ex. 35) shows that all but claim 13 were added to the application in April 1940. Claim 13 had been added in October 1938. I am satisfied that these claims were added to the Smith application to cover certain known principles and structural elements of the General Electric fluorescent lamps; for which a tremendous commercial demand had developed from the date they were offered to the public on General Electric's regular schedules in April 1938.

Smith's invention was for "rectifiers, amplifiers, oscillators," etc. In its use as a rectifier the patent concerned itself with the ionization of a metal vapor. According to the specification the device would operate with "either a single gas or a mixture of

two or more gases." If a single gas is used it "may comprise mercury vapor or the vapor of an alkali metal (preferably caesium)." When mixed gases were employed "the second gas preferably comprises an inert monatomic gas such as helium, argon, krypton, xenon or other gas which when not ionized does not greatly hinder the passage of electrons."

If mercury vapor was used, Smith was interested only in its ionization as the medium for the passage of the electrons. He did not seek the excitation of the mercury and the production of ultra-violet rays. His objective was to facilitate the process of ionization and thus to improve the rectification. He sought a gaseous medium that would ionize at low voltage. If his goal had been the production of ultra-violet rays he would not have recommended, as an alternative to mercury vapor, the use of the vapor of caesium, which when subjected to the action of the electrons does not give off ultra-violet rays. In Smith's rectifier, with its cathode close to the anode, very little ultra-violet rays would be given off even with mercury vapor. At best they would be an unwanted by-product and so centered in some of the patent figures that they would not reach the surface of the container.

The Raytheon Manufacturing Company was Smith's assignee, when patent No. 2,201,817 was issued on May 21, 1940. Defendant, Hygrade, filed its answer in this suit July 1, 1940, pleading a counterclaim and listing the Smith patent as one under which Hygrade was "the exclusive licensee in the fields of fluorescent lighting and sterilization * * * with the right to sue for infringement thereof and to recover profits and/or damages in these fields."

Defendant argues that claims 12 to 15 of Smith's original application were directed to the same broad subject matter as the Smith claims in suit and that in July 1927 the Examiner had allowed a claim which had a broader scope than the Smith claims in suit. From that defendant concludes that all Smith did was to narrow his claims, when he made amendments thereto in October 1938 and April 1940. Assuming the premise to be true that Smith's earlier claims were broader—narrowing them, that is making them more specific, was done for the purpose of having the claims so worded that they might read on elements of the General Electric fluorescent lamp, although

Smith's original disclosure did not even remotely suggest any such possibility.

Claim 13 of the Smith patent as issued May 21, 1940, had its origin in claim 14 of the original application of September 9, 1925, which read as follows:

"14. In the art of electronic discharge, the method which comprises starting the discharge through a gas having a substantial vapor pressure when cold, generating by the starting discharge a gas having a higher vapor pressure when cold, and maintaining the discharge by the ionization of the latter gas."

On January 23, 1926, the Examiner reported that certain claims, including No. 14 "are indicated as having patentable subject matter" and on July 21, 1927 the Examiner reported that said claims "stand allowed." This was repeated in Office Action September 22, 1928.

By an amendment of February 27, 1929, the word "higher" was changed to "lower," to correct "an obvious error." By Office Action November 16, 1929 claim 14 as thus amended was allowed and it remained allowed in Office Action of February 14, 1931. By amendment August 14, 1931, the word "vapor" was cancelled from claim 14. The claim as thus amended was reported as allowed by Office Action March 16, 1932. On September 15, 1932, the applicant directed the Commissioner to cancel certain claims, including No. 14, explaining that they would "be made the subject of a divisional application directed to the special multiple gas pumping arrangement disclosed in the present application."

Six years later, on October 12, 1938, the applicant added a number of claims including a new claim No. 92, which was old claim 14 in the form in which it appeared at the time it was cancelled on September 15, 1932. Concerning old claim 14 and new claim 92 the applicant's attorney explained:

"As indicated above, claims 88 to 95 are copies of claims either allowed or indicated as allowable in this application. No requirement for division was made as to these claims, and therefore it is believed that they should properly be included in the application. Since they are originally made in this application, of course there is no question but that they read upon the present disclosure."

By an amendment filed April 15, 1940, claim 92 was amended on line 2 by cancel-

ling "the" before "discharge" and inserting the words "an arc-like," so that it then read—"an arc-like discharge." After the second word "cold," the amendment inserted the clause "and a pressure of the order of one to one hundred microns during normal operation."

On April 18, 1940, the specification of the Smith patent was amended materially. Lines 11 to 18 of page 9 of the original application (Ex. H–1) were recast and supplemented by the addition of two sentences, one of which reads as follows:

"In the specification and claims the term —'arc-like discharge'—and equivalent phrase mean, a discharge in which the cathode voltage drop is of the order of the ionization voltage of the gas."

How much that amendment changed the original specification appears from a comparison of lines 11 to 18 of page 9 of the original specification (Ex. H–1) and the corresponding part of the amendment of April 18, 1940.

The amended specification of April 1940 reads:

"After the initial operation of the tube is continued for a very brief interval the gas is at sufficient pressure and ionization and in sufficiently excited condition so that the voltage drop may be as low as the ionization voltage of the gas (10.4 volts for mercury vapor) and even considerably lower, probably due to the heat and light radiations inside the cathode and also the losses are relatively smaller. Under these conditions the cathode voltage drop is likewise of the order of the ionization voltage of the gas or less. In the specification and claims the term—arc-like discharge—and equivalent phrases mean, a discharge in which the cathode voltage drop is of the order of the ionization voltage of the gas in the device or less."

The original specification of September 1925 provided:

"After the normal pressure in the cathode has been developed by the initial operation of the tube for a very brief interval the voltage drop may be as low as the ionization voltage of the gas (10.4 volts for mercury vapor) and even considerably lower, probably due to the heat and light radiation inside the cathode. And the losses are relatively small compared to the losses which would occur if the pressure in the cathode were as low as the pressure outside the cathode."

The terms "arc-like discharge" and "cathode voltage drop" did not appear in the original specification.

The second paragraph of the original specification states that it is one of the objects of the invention "to provide devices of the character referred to (rectifiers, amplifiers, oscillators, etc.) which operate with low voltage drop *"between cathode and anode* when passing relatively large current." (Italics supplied.) The voltage drop between cathode and anode is not the same thing as the "cathode voltage drop."

In yet another part of the original specification, page 5a, line 21, the following appears (referring to Fig. 1 of the patent):

"As the mercury is vaporized the voltage drop between cathode and anode decrease until maximum temperature is reached at which time the mercury pressure in the tube may be of the order of a fraction of a millimeter of mercury, *e.g.* 0.01 m.m. The pressure inside the hollow cathode may be several times as great."

That disclosure in the original specification did not warrant the amendment on April 15, 1940, of original claim 14 (cancelled September 15, 1932, and restored October 12, 1938) by the addition of the clause relating to the mercury vapor pressure as "a pressure of the order of one to one hundred microns during normal operations." [The General Electric fluorescent lamps were put on a sales order list in April 1938. The Inman-Thayer scientific paper on "Low Voltage Fluorescent Lamps" had been published in June 1938 showing the mercury vapor pressure of the fluorescent lamps at various operational temperatures and the most efficient pressure range for the production of the 2537 A—ultra violet rays. Hygrade had started to copy and sell them in October 1938. A later description of the General Electric fluorescent lamps and its elements appeared in the General Electric Publication in August 1939. Ex. WW.]

The amendment of claim 92 (formerly claim 14) and of the corresponding parts of the specification in April 1940, resulted in claim 13 and a specification that had no basis in the original Smith specification. Both amendments were made with the ulterior purpose of furnishing a defense to the present litigation. This practice was condemned in Railway Co. v. Sayles, 97 U.S. 554, 24 L.Ed. 1053. The Smith

amendments so broadened the original specification and claims that claim 13 of the patent as issued is void. Schriber Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34.

Claim 43 in suit had its origin in claim 130, which was added to the Smith application by an amendment April 2, 1940. It reads as follows:

"43. An electronic discharge device containing a gas having a substantial pressure when cold and a gas having a lower pressure when cold, means for starting a discharge through said first-named gas and for maintaining the discharge by the ionization of the latter gas."

"Note. (This is an apparatus analog of claim 92.)"

Claim 92 referred to in the note was claim 14 of the original patent, which I have just discussed. In explaining claim 130 applicant's counsel "remarked": "Claim 130 is an apparatus analog of method claim 92 and is believed to be clearly allowable in view of the history of claim 92." On April 15, 1940, claim #130 was amended by adding thereto the clause—' "said latter gas having a pressure of the order of one to one hundred microns during normal operation," and with that addition was issued as claim 43. What I have written of claim 13 of the patent as issued applies also to claim 43.

Claims 72 to 78 and claim 80 in suit were added to the Smith application as claims 150 to 165 and as claim 167, on April 15, 1940. Two of the claims, 164 and 165, are said to have had their source in former claims 130 and 132. As to claim 132 the applicant's attorney stated (File Wrapper Ex. 35, p. 214): "This is claim 3 of applicant's co-pending application, Serial No. 134,559, filed April 2, 1937. Said claim 3 in its present form was allowed in said co-pending application on January 17, 1940." Claim 132 was allowed as claim 45 of the present application, but is not in suit. As to claim 166, applicant's attorney stated (File Wrapper page 251): "This is a modification of claim 99 in applicant's co-pending application 88,558." Thus an outside source, not the original Smith application herein, was the true source of certain elements of these claims. They were all part of the April 1940 effort to further amend and enlarge the original Smith application of September 1925. The October 1938 amendment resulted in additional claims finally allowed as numbers 11 to 42 inclusive. The April 1940 amendments tain mercury vapor pressures.

Of claims 72 to 78 and 80 in suit, claims 72 and 73 refer to a mercury vapor pressure "of the order of one to one hundred microns during normal operation"; claims 74 to 78 inclusive refer to it as "having a pressure of the order of a fraction of a millimeter"; and claim 80 describes the mercury vapor as "having a pressure of the order of ten microns during normal operation."

Smith in his original specification mentions a mercury vapor pressure as a fraction of a millimeter. On that defendant builds a part of its claims 74 to 78. Claims 13, 43, 72 and 73 mention mercury vapor pressure of the order of one to one hundred microns, and claim 80 brings it down to "of the order of ten microns." "Smith was not interested in the range of pressure or the most efficient generation of ultra violet light * * * and there isn't anything of any importance to be attached to the fact that Smith happened to mention a particular vapor pressure for the mercury" according to a statement of defense counsel made at the trial in the course of his discussion of the LeBel application, which was filed later than Smith. The statement runs counter to all of the finely spun arguments of defendants' brief, intended to show that the original Smith application of September 1925 supports the great batch of amendments added in April 1940, specifying certain mercury vapor pressures.

The Smith rectifier had, as its most important element, a cathode surrounded by a hood. It was clearly taught in the original specification that the vapor pressure inside the hooded cathode was many times as great as it was outside the hood. In the claims in suit this essential characteristic of Smith's device is not mentioned. On the contrary it appears that the claims contemplate a uniform vapor pressure throughout the device. Claims 75 and 76 which refer to a shield of the cathode, say nothing at all about any difference between the mercury vapor pressure inside the hollow cathode and that outside, such as the original Smith specification describes in discussing the operation of Figure 1 of his patent. The original Smith specifications stated: "It is not only desirable to have high pressure of density in the region of the cathode but also to have low pressure near the anode." The mercury vapor pressure of

the fluorescent lamp is practically uniform throughout.

Smith's invention for a rectifier had no thought of the production of ultra-violet rays or their use as an element of his invention. The means for facilitating the rectification and passage of the current, as taught by Smith, depended on the ionization of a metal vapor; the fluorescent lamp is based on the excitation of mercury vapor so as to produce abundantly ultra-violet rays of 2536.7 A. The ionization and the excitation of mercury involve different phenomena which can be produced at different voltages.

The period covered by these October 1938 and the April 1940 Smith amendments overlapped in part similar efforts made to enlarge the scope of the original LeBel patent No. 2,126,787 issued August 16, 1938, by an application for a LeBel reissue patent filed May 24, 1939. The same attorney, acting for the Raytheon Manufacturing Company, represented both LeBel and Smith in these endeavors.

The General Electric fluorescent lamps and germicidal lamps do not infringe any of the claims of the Smith patent in suit. The original specifications of the Smith patent and its original claims were amended, enlarged, distorted and supplemented in 1938 and 1940 for the purpose of having them read on the General Electric lamps. To the extent that the unworthy objective was achieved in part, the Court will disregard it. The claims are clearly void. There was nothing new in the original Smith specification of September 1925 that is embodied in General Electric's fluorescent lamps and germicidal lamps.

Plaintiff cited certain prior art against the Smith patent. I have disposed of those citations in findings of fact which will be filed with this opinion. The cathode shield, a main feature of the original specifications filed by Smith in September 1925, had been disclosed in patents to Greiner et al. (No. 1,295,481 issued February 25, 1919) and in a German patent to Siemens et al. (No. 323,206) issued in May 1916. The use of auxiliary electrodes to assist in starting had been disclosed in the Kruh patent (No. 1,032,914 issued July 16, 1912) and in the British patent to Filippo et al. (No. 150,692, accepted November 28, 1921). There were disclosures in the Hertz patent (No. 1,726,107 issued August 27, 1929 for which the application was filed February 18, 1925) of a combination of argon gas at a pressure of four millimeters and of mercury vapor, and the Claude patent (No. 1,231,494, issued June 26, 1917) showed a combination of neon gas and mercury vapor. Further Smith's device, whatever it was originally, never had any commercial use. Whatever it took from the prior art and combined in the original Smith specification of September 1925, did not meet satisfactorily any new demand or show invention.

The Smith patent in suit, No. 2,201,817, applied for September 9, 1925, is not entitled to the filing date of a co-pending Smith application filed April 15, 1924 on which patent No. 1,901,128 was issued. The earlier co-pending Smith application was not for the same invention as the later Smith application. The earlier Smith application did not disclose any invention contained in the Smith patent in suit. The doctrine of continuity does not apply. The claims in suit could not have been properly issued on the specification of the earlier application. General Electric Co. v. Continental Fiber Co., 2 Cir., 256 F. 660; Good Roads Co., Inc. v. Chas. Hvass & Co., Inc., 2 Cir., 70 F.2d 625.

Defendants' counterclaim on the Smith patent will be dismissed on the merits.

### The LeBel Patents

Clarence LeBel was an employee of Raytheon, Inc., in 1929. On August 12, 1929, he executed an application (Serial No. 385,707) for a patent on an electric lamp and on the same day he assigned his rights to Raytheon, Inc. The application and the assignment were filed in the Patent Office August 14, 1929. About a month or two later he left the employ of Raytheon. On August 16, 1938, the original LeBel patent, No. 2,126,787 was issued, containing fifteen claims. On May 24, 1939, LeBel and Raytheon Manufacturing Company (successor to Raytheon, Inc.) made application (Serial No. 275,549) for a reissue patent and while the application was pending, in February 1940, defendant Hygrade acquired a license thereon from Raytheon, with the right to bring suit. Reissue patent No. 21,954 was granted November 25, 1941, containing forty-nine claims. The infringement of certain claims, Nos. 1, 7, 11, 12, 13, 25, 26, 27, 28, 29, 30, 41, 43, 48 and 49, in the reissue patent, is charged in defendants' counterclaim.

Of the claims in suit Nos. 1, 7, 11, 12, and 13 were in the original LeBel patent with the same numbers. Claims 25, 26, 27,

28, 29, and 30 of the Reissue Patent correspond, respectively, to claims 1, 6, 7, 11, 12 and 13 of the original LeBel patent, with the addition of the words "exposed to the air" in describing the "container," and with the addition at the end of claims 25, 26, 28, 29 and 30, and in substance towards the beginning of claim 27, of the following clause: said lamp being "designed and adapted to generate for utilization ultra-violet light having a wave length of the order of 2537 Angstrom units." Claims 41, 43, 48 and 49 contain so much new matter that it is difficult to compare them with any claim of the original patent.

Although the Examiner on the application for the Reissue patent found that Le-Bel's excuse of inadvertence and mistake (R.S. § 4916, 35 U.S.C.A. § 64) was baseless, he nevertheless permitted certain important amendments, containing new matter, to the original specification and claims, and the addition of a number of new claims, which should have been denied as not for the same invention as the original patent. The Examiner failed to take notice of the intervening rights of the public and of the General Electric Company in the fluorescent lamps sold publicly by General Electric Company since April 1938. Further, some of the Reissue claims that were in the original patent were broadened considerably so as to cover in a general way the structural elements of the General Electric fluorescent lamps.

LeBel original application (Ex. 38), filed August 14, 1929, was for an ultra violet lamp. The opening paragraph of the specification states:

"This invention relates to electric lamps and particularly to a lamp which will radiate a substantial portion of its energy in a predetermined portion of the spectrum. The lamp of this invention is characterized by an extraordinary high output of energy lying in the ultra violet portion of the spectrum."

The LeBel lamp was to contain mercury vapor and an inert gas such as argon or neon "at certain pressures when carrying a discharge." The pressure of either of the rare gases (such as argon) "may be between 1 and 8 m.m." and "is not very critical and may be varied over substantially wide limits." But the specification provided that under the operating conditions the mercury vapor pressure in the lamp "must be between 1 and 8 microns" in order to produce the desired efficient ultra violet radiation of 2537 A.

That the pressure of the mercury vapor would vary with the temperature was well known from the International critical tables. Marshall had taught in 1927 and 1928 (Exs. 37b and d) that the most resonance radiation, 2537A, in a mercury vapor lamp, was produced when the mercury vapor pressure was about 10 microns. The Belgian Phillips' patent of November 30, 1928 (Ex. 37c) operated at about 50°C, where mercury vapor pressure would be about 12.6 microns.

Certain studies and scientific papers published June, 1938 by Thayer and Inman, two leading research men in the General Electric laboratories, who wrote on Low Voltage Fluorescent Lamps (Ex. 4), contain a number of graphs, showing the effect of the various elements entering into the construction and operation of the fluorescent lamp. One of the Thayer and Inman's graphs indicates that just as high and efficient a generation of the 2537 A ultra-violet radiation may be had with a mercury vapor pressure of between 8 and 40 microns, as one would get with a pressure of between 2 and 8 microns. Thus the whole theory of LeBel's original patent application, that the 1 to 8 micron range was critical was destroyed by the Inman-Thayer article of June 1938. Their graphs showed that at a bulb temperature of about 28°C with a mercury pressure of 2.4 microns 90% efficiency radiation was obtained and that at 62°C with a mercury pressure of about 30 microns the same 90% efficiency was obtained. Within the range of 2.4 to 30 microns was the greatest efficiency.

Further, the pressure of the mercury vapor in the General Electric lamps in operation varied within a range of 4 to 39 microns, according to the wattage, the size of the lamp, the ambient temperature and the type of fixture. The temperature of the lamps when operating was about 15° to 20°C above the ambient air; if the lamp was in a fixture the bulb temperature would be somewhat higher. (Ex. 31.) Since the lamps are designed to operate under different climatic conditions, and within the range of the ambient temperature to be found in homes, offices and industrial plants, the mercury vapor pressure within the lamps in operation will vary in different locations. The General Electric lamps are

not constructed with any cooling device to maintain the mercury pressure within any fixed range. It was not found necessary to maintain the mercury pressure within a narrow fixed range. The lamps were designed to operate on a current of 110-220 volts and their whole structure gave them an efficient production of 2537A ultra violet radiation within a range, not limited by LeBel's critical range of 1 to 8 microns, but extending well beyond the 8 and as high as 40 microns. Some of the General Electric lamps do not operate at a pressure of 8 microns or less. Others operate generally at ranges beyond 8 microns. None of the General Electric lamps operate at all times within the 1 to 8 micron critical range of LeBel's original specification. (See tabulation, Ex. 31).

It was apparent from the Inman-Thayer paper published June 1938, and from an analysis of the General Electric fluorescent lamps sold on the market in 1938 that the LeBel patent could not be used as a legal weapon against them unless the specified LeBel critical mercury vapor pressure range was extended beyond the 8 microns and unless the scope of the LeBel patent was in other ways broadened by amendment of its specification and claims, and by the addition of entirely new claims.

Why this was ever permitted it is difficult to understand. The Examiner realized that there was no valid excuse for the reissue patent and said so. A study of the File Wrappers on the Original and Reissue LeBel applications has convinced me of the entire lack of merit and of good faith in the LeBel application for a Reissue patent.

File Wrapper History of the Original LeBel Application of August 14, 1929

LeBel in his original application considered it "necessary to maintain the mercury pressure within critical limits." He fixed those limits as "between 1 and 8 microns." I quote the following from his original specification:

"I have discovered that a metal vapor such as mercury and an inert gas such as argon or neon at certain pressures when carrying a discharge, exhibit a remarkable phenomenon. Under operating conditions the pressure of either one of the rare gases may be between 1 and 8 mm. while the pressure of the mercury must be between 1 and 8 microns. The pressure of the rare gas is not very critical and may be varied over substantially wide limits. It is, how-ever, necessary to maintain the mercury pressure within critical limits. This may be done by either having the necessary amount of cooling surface in the tube or by artificially cooling the tube so that the desired pressure is maintained. Apparently it is immaterial in what manner the gaseous discharge is effected. Thus the discharge through the gas may be effected by one or more thermionic cathodes, one or more cold cathodes in the usual manner or may be effected by inducing high frequency alternating currents in the gas."

"By varying the mercury pressure over the wider limits as from 1 to 20 microns, it is possible to ionize both the gas and the vapor and change the color of the resulting light. In fact it is possible to go from the pure color of the gas to the pure color of mercury through the combination of the two colors by properly adjusting the mercury vapor pressure. In this latter case, however, the lamp does not emit as great a portion of its energy in the narrow region of the ultra violet spectrum as is true when the mercury pressure is maintained within smaller limits."

On May 24, 1930, the Examiner rejected all the first sixteen claims of the LeBel application for various reasons and cited certain prior art—the patent to George No. 1,-671,109; to Lebrun No. 1,709,858; to Hertz No. 1,726,107; German patent No. 377,-482; and an Article by Hull on "Gas Filled Thermionic Tubes." On September 30, 1930, Raytheon, as assignee, named a new attorney to prosecute the application. In seeking a reconsideration on October 18, 1930, of the Examiner's adverse action, the attorney made certain amendments to the specifications and added claims 17 to 21. He stated:

"It is believed that upon a full realization of the differences which exist between the applicant's invention and the references cited the Examiner will appreciate that the claims in their present form are patentable over the references. The applicant has discovered that if the mercury vapor pressure be kept at a considerably lower value than has heretofore been used, with the critical limits defined in the specification, together with a rare gas at substantially the pressures specified, the energy emitted from that lamp will be particularly rich in ultra violet rays. Although it is true that other patents disclose mixtures of mercury and a rare gas, yet in none of these patents is there the slightest suggestion that during

518

the normal operation of the lamp the mercury vapor be kept at the low pressure specified. During the normal operation of lamps of this type the temperature of the container is ordinarily allowed to rise to a fairly high point. However, the applicant designs his type so that a sufficient surface is provided which keeps the temperature of at least a portion of that tube at such a value that the mercury vapor pressure is confined to the low value of between 1 and 8 microns."

"It is believed that the Examiner will appreciate that a disclosure in which there is no provision for limiting the mercury vapor pressure, but which allows the mercury vapor pressure to rise considerably above the point which the applicant specifies, does not anticipate the particular feature which the applicant has defined in each of his claims."

On June 15, 1931, the Examiner rejected all claims, citing Garret patent 1,783,643; Hull 1,790,153; and British patent 150,692. On December 8, 1931, the attorney filed an amendment to claim 21 and added two new claims 22 and 23. He again urged that the mercury vapor pressure range of 1 to 8 microns was "quite critical" and that—"the applicant has so limited his claim that only those lamps which use a low pressure of mercury of the particular pressure range specified to obtain this result are covered."

The applicant's attorney referred to the prior art cited by the Examiner and argued:

"It is clear, therefore, that in each of these patents the pressure of the mercury will rise to a point considerably higher than eight microns. Since, as the applicant has stated, the pressure range in which the mercury vapor can be operated and still obtain the desired result is quite critical, the lamps as shown in the patents [of the prior art] might have pressures fairly close to that as specified by the applicant and yet fail to obtain the results which the applicant obtains, due to the fact that their operating pressures lie outside of the critical range."

On May 24, 1932 the Examiner again rejected all claims and advised the applicant to prepare for final action. On October 13, 1932 the attorney directed the Patent Office to cancel claims 1 to 18 inclusive, 20, 22 and 23; also to cancel claim 21 and substitute therefore claim 24 (that left claim 19); also to add claims 25 to 28 inclusive. In his "Remarks" appended to this request the attorney stated:

"Most of the claims in the case have been cancelled in view of the citation of the British patent No. 307,982. However, it should be noted that although the British patent uses a lamp in which it keeps the pressure of the mercury vapor low in order to emphasize the emission of the 2536 line, yet the pressure range in which it operates its device is considerably different from that specified for the operation of the applicant's device. It will be noted that the applicant specifies that the pressure of the mercury vapor in his lamp must lie between one and eight microns and that this range of pressures is quite critical. The British patent, however, specifies that the pressure of the mercury vapor in the device lies between 20 and 280 microns. Thus it will be seen that the entire range of the operating pressures in the British patent lies entirely outside of the critical range specified by the applicant for his device."

Again the Examiner rejected all claims (February 24, 1933) and suggested a divisional application as to some. Applicant thereupon (August 19, 1933) added two claims #29 and 30, and elected to prosecute the others, except claim #27 which was retained pending final determination. Applicant's attorney again stressed the critical low mercury vapor pressure of his patent (1 to 8 microns) as disclosing invention over the British patent 307,982 with its specified pressure of 20 to 280 microns, and urged that "claim 19 which defines this difference is therefore believed to be allowable over the British patent." Claim 19 specified "mercury vapor at a pressure of between 1 and 8 microns during the normal operation of the lamp, and a rare gas at a pressure of between 1 and 8 mm."

By Examiner's action of November 16, 1922, all claims except claim 24 were rejected. (Claim 24 was related to starting means.) The Examiner again cited British patent 307,982; also Hull 1,929,143; Meyer, et al. 1,843,645; and German patents 302,806 and 377,482. The applicant on April 24, 1934, amended claim 19 and claims 25 to 28 inclusive. He also added claims 31 to 36 inclusive. In the "Remarks" accompanying the request for those amendments applicant's attorney argued:

"Specifying a particular gas pressure for the operation of a device has always been accepted by the Patent Office and the courts as being a definite structural limitation, and the Examiner is entirely unwarranted in

holding that such recitation of pressure is a recitation merely of a result"—

And he urged that "the mercury vapor pressure at which the new result obtained by the applicant's device is secured is a critical range."

Concerning new claim 34 he said:

"Furthermore, on page 3 is recited an operation of the tube whereby the color emitted by the tube may be varied by varying the vapor pressure of mercury between one and twenty microns. A new claim 34 directed to this feature has also been added. This feature is, of course, one which is missing from the references of record and should be allowed."

The last quotation shows that the pressure range up to 20 microns was not relied upon for the efficient production of ultra-violet light but merely as a range within which, by varying the mercury vapor pressure, "the color emitted by the tube may be varied". The color was that of the gases within the tube while in operation—it was not any fluorescent color from any material coating the tube.

The Examiner by Office Action on May 4, 1934, suggested three claims (found allowable) for the purpose of interference. The three claims were thereupon adopted by the applicant for that purpose as claims 37, 38 and 39 on May 8, 1934. Responsive to said amendment—the next Office Action was on July 31, 1934, when certain additional patents in the prior art were cited as anticipating some of applicant's claims. The patents cited were Kruh, No. 1,032,-914; Spanner et al., No. 1,925,648; British patent to Phillips, No. 225,218, and German patent to Schmierer, No. 377,482.

The Examiner rejected all claims except claims 19, 24, 28, 29, 30, 35 and 36 which were found allowable. Claims 37, 38 and 39 which had been suggested by the Examiner as allowable for the purposes of interference were rejected by him as unpatentable over the Kruh patent in view of George patent 1,671,109. The action was taken because of the receipt by the Examiner of a decision of the C.C.P.A. in Ex Parte Zecher and Mellema decided April 16, 1934. (70 F.2d 270, 21 C.C.P.A. (Patents) 1041.)

The applicant on January 25, 1935, again amended certain of his claims (25 and 26) and added claims 40 to 45 inclusive. His attorney stated:

"As has been previously set forth, the applicant secures his novel results because the pressure of the mercury vapor is maintained below eight microns during the operation of the device. The Examiner has recognized that this feature is a patentable one as evidenced by his allowance of certain claims, among them claims 29 and 30. As we compare the applicant's invention with the prior art, we see that the prior art fails to suggest the operation of the mercury vapor below the maximum pressure specified by the applicant. Two new claims 40 and 41 are submitted herewith which present this subject matter and define the requisite maximum value of the vapor pressure as eight microns, while defining the lower limit of the vapor pressure in somewhat different language than heretofore set forth. It is believed that the applicant was the first to point out that within the range of pressure below eight microns, a maximum of radiation efficiency can be secured at a certain pressure. Claim 41 in addition to calling for a pressure below eight microns, also specifies the operation of the device in a pressure range sufficient to produce the above result, and therefore fix a lower limit to the pressure. Claim 40 defines the lower limit as being sufficiently high to produce ionization of the vapor during operation and the emission of radiation from said vapor. It is respectfully requested that these claims likewise should be allowed."

Discussing his claim 34 the applicant's attorney distinguished it from the British patent 225,218. He stated:

"Claim 34 defines a method of operation in which pressures are varied in order to obtain variation in color. Furthermore, the limits between which the pressure is varied are clearly defined. In the first place there cannot be found in the British patent any variation of vapor pressure to produce a variation in color."

The Examiner on April 16, 1935, rejected all claims except 19, 24, 28, 29, 30, 34, 35 and 36 (claim 27 not being elected was not acted upon). He cited the Mackay patent 1,603,087; the Meyer patent 1,843,645 in view of the German patent 366,482; the British patent 225,218; and the Kruh patent.

Certain amendments were offered by applicant October 4, 1935, among them being the addition of the phrase "the pressure of said vapor being less than about twenty

microns" to claims 37, 38 and 39 inclusive. (A General Electric fluorescent lamp had been exhibited at the Cincinnati Convention September 3–5, 1935.) In response to said amendments the Examiner on January 6, 1936 again rejected all claims except #27 not acted upon, and except claims 19, 24, 25, 26, 28, 29, 30, 34, 35 and 36, which were allowed. The rejection was made final. On May 18, 1936, claim 26 was also allowed.

Applicant appealed to the Board of Appeals on November 12, 1936 from the action of the Examiner in rejecting claims 36 to 45 inclusive. In his brief he stated:

"The manner in which a certain vapor pressure is secured is a feature which is one of the commonest in the art of gaseous discharge tubes. If a person in the art specifies operation at a certain vapor pressure, such specification can have only one meaning and that is that the envelope containing the vapor must be operated at a certain definite temperature. Obviously there are many ways of obtaining a particular temperature of an envelope. The manner in which this temperature is obtained is not an essential part of the present invention, and the applicant cannot conceive of how such a method might constitute invention. The fact that a particular temperature means a particular vapor pressure is so well recognized that various tables have been published showing the exact mercury vapor pressure which is obtained at various temperatures. One table of this kind is to be found in the International Critical Tables, Volume III, page 206. It is submitted that in this way no more definite statement of structure in so far as vapor pressure is concerned can be given than to specify the value of that vapor pressure."

The Board of Appeals on July 19, 1937 decided "that the claims which are directed to the critical pressure of the metallic vapor (below 8 microns) to obtain a more efficient ultra-violet ray lamp are not met in the prior art." The Board held that "Claims 37, 38, 39 and 44 do not introduce this critical pressure and are unpatentable." Concerning claims 40 to 45 the Board said: "As we view these claims, the essential feature is the pressure condition of the metallic vapor during operation and the limit of eight microns is definitely stated in all except claim 44." The Board accordingly disallowed claim 44 but allowed claims 40 to 43 inclusive and claim 45.

The attorney for the applicant on January 11, 1938 requested the Commissioner of Patents to cancel claims 37, 38, 39 and 44 and remarked: "Inasmuch as the rejected claims have been cancelled this application is now in condition for allowance, an early notice of which is respectfully requested." On June 28, 1938, the applicant requested the Commissioner to cancel claim 28.

The patent was issued on August 16, 1938, as No. 2,126,787 containing in all 15 claims. In claims 1 to 6 the mercury vapor pressure was stated as "between 1 and 8 microns during the normal operation of the lamp." In claims 11 and 12 the pressure of the mercury vapor is stated as "being below eight microns"; claim 13 stated "the pressure of the metallic vapor during operation being below eight microns." Claims 14 and 15 refer to "the pressure of the sodium vapor during operating being below eight microns."

The only claim of the LeBel patent issued in August 1938, which refers to "the pressure of the mercury vapor between one and twenty microns," is claim 8, which reads as follows:

"8. The method of operating a gaseous conduction lamp comprising a container, a gaseous filling in said container, said gaseous filling comprising mercury vapor and an inert gas, and means for producing an electrical discharge through said gaseous filling which consists in varying the pressure of the mercury vapor between one and twenty microns, whereby the color emitted by said lamp is varied, the pressure of said inert gas being greater than the pressure of the mercury vapor."

This is the so-called "color" claim (34 as filed) to which reference has hereinabove been made.

The foregoing is a rather detailed recital of the history of the original LeBel application as gleaned from the File Wrapper in the Patent Office. It is apparent that for years the applicant's attorney had stressed the fact that invention could be claimed on a mercury vapor pressure of 1 to 8 microns, specified as critical, for the most efficient production of ultra-violet rays of 2537 A. The 1–20 micron range was suggested as an appropriate range within which, by varying the mercury vapor pressure, different colors would appear in the mixed gases within the lamp. In January 1935, the applicant had tried to draw away from the limitation—the 1 to 8

micron range—and spread out generally to a range of 1 to 20 microns. The British patent No. 307,982, covering a range of 20 to 280 microns of mercury vapor pressure had been cited against LeBel's original application. To obtain the intervening range of 8 to 20 microns, plus his originally specified critical range of 1 to 8 microns, the LeBel original application was amended in claims 37, 38, 39 and 44. The Examiner and the Board of Appeals rejected the amendments. The applicant then cancelled those claims and asked that the patent be issued. This was done and patent, No. 2,126,787, was issued August 16, 1938. The applicant thereby estopped himself from asserting any broader claim for his invention, so as to include the pressure range of 8–20 microns.

### File Wrapper History of LeBel's Application for a Reissue Patent

On May 23, 1939, LeBel and the Raytheon Company made application for a Reissue of the letters patent upon an amended specification. Six new claims, Nos. 16 to 21, were added, in all of which the mercury vapor pressure was stated to be "in the range of one to twenty microns." LeBel filed an oath with his application for the reissue patent in which he stated that he verily believed that the Letters Patent originally issued were "inoperative" because the specification was defective in failing to adequately claim his invention; that the errors arose "from inadvertence and mistakes without any fraudulent or deceptive intention." The alleged mistake was the failure to claim a range of one to twenty microns for the mercury vapor pressure.

The following is quoted from LeBel's affidavit (oath) of May 15, 1939, seeking the reissue:

"The deponent, at the time of the filing of the original application, was a research engineer, occupying himself exclusively with scientific research and investigation, and had no faculty for and familiarity with the analysis of the language of legal documents or with patent laws, patent practice, and formulation of claims of patents of the United States; that he had to rely upon attorneys to properly prepare the specification and to claim the novel features of the invention in the various respects hereinbefore specified; that the subject of gaseous discharge lamps involved in the invention is very complicated and difficult to grasp by persons who do not devote a great deal of their time to the study thereof; that he spent much time and effort in instructing his attorneys and making them understand the subject matter of his invention; that he believed that his attorneys understood him and that they properly represented him in the preparation of the application and claiming of the invention; that he believed, upon representation of his attorneys, that the original claims of said original application were sufficient to secure adequate protection for his invention; that a month or two after said original application was filed, he left the employ of the assignee of said original application; that he is informed and believes that about a year thereafter the original power of attorney was revoked and a new attorney appointed by said assignee; that from the time he left the employ of said assignee until recently said deponent has had no contact with any attorneys appointed by said assignee to carry on the prosecution of said original application; that he is informed and believes that recently said assignee realized the inadequacy of the original patent, and requested its attorney to call upon said deponent in order to call his attention to said inadequacies; that said deponent had not realized the inadequacies of said original patent until said discussion with the attorney of said assignee; that in fact the attorneys in securing said original patent had failed to grasp the full and broad significance of the invention, and omitted to claim the important and characteristic features and aspects thereof hereinbefore set forth; and that upon realizing said inadequacies deponent thereupon immediately took steps through his attorney toward filing a reissue application to include the claims directed to the broad features of his invention set forth above in his patent, and to remove the defects hereinbefore recited."

The Examiner on July 29, 1939, rejected claims 16 to 21 of the reissue application for the following reasons:

"Claims 16 to 21 inclusive, are rejected on the ground that the oath does not set forth such an inadvertence, accident or mistake, as to support the grant of a reissue patent containing these claims.

"The reissue oath alleges among other things 'that in fact the attorneys in securing said original patent had failed to grasp the full and broad significance of the invention, and omitted to claim the important and characteristic features and aspects thereof here-

inbefore set forth', referring to the added claims 16 to 21.

"The record of the patent shows however that the attorneys therein of record did in fact prosecute claims to this subject matter and differing therefrom only in immaterial points. Claims 37, 38 and 39 of the original application were drawn to this same subject matter, were rejected by the Examiner twice, were appealed Nov. 13, 1936, along with certain other claims, and were held unpatentable by the Board of Appeals in its decision dated July 19, 1937 (paper No. 30), following which applicant on Jan. 12, 1938 directed the cancellation of these claims. No appeal was made from the decision of the Board of Appeals nor was a suit under Sec. 4915 prosecuted.

"Applicant's failure to further prosecute these claims and his cancellation of the same clearly does not amount to such inadvertence, accident or mistake as required under the Reissue Statute.

"Claims 16 to 21 inclusive, are further rejected on the ground of estoppel by reason of the cancellation of original claims to the same subject matter differing therefrom only in choice of words or in trifles which are not material.

"G-H Rim Co. v. Firestone Steel Products Co., 6 Cir., 29 F.2d 825; 381 O.G. 3."

On December 28, 1939, the applicant amended claim 16 slightly and cancelled claims 17 to 21, substituting in their place claims 22 to 29 inclusive. These new claims all included a statement that the pressure of the mercury vapor was "in the range of one to twenty microns."

In the "Remarks" accompanying the proposed amendment the attorney for the applicant, who for eight years represented the applicant on the original patent application, referred to an oral interview he had had with the Examiner on the reissue application (not the same Examiner who had passed upon the original application). The attorney stated:

"The courtesy of the Primary Examiner in granting an oral interview in connection with the present case is gratefully acknowledged.

"During said interview it was pointed out that the aspect of the invention which the reissue is intended to cover is an aspect which was not before the Board of Appeals and was not in claims 37, 38 and 39 of the original application. Those claims were directed primarily to the provision of Wehnelt cathodes in a tube, and pressure of vapor below twenty microns irrespective of how said pressure was obtained.

"The novel aspect of the applicant's invention under consideration consists in the teaching of the applicant that when a lamp of the nature described is exposed to the outside air and the pressure range is secured by proper selection of the amount of current passing through the lamp, a maximum of generation of ultraviolet light from mercury vapor is secured. Tests have shown that if the mercury vapor is maintained within a certain range, for example one to twenty microns, the ultraviolet light is efficiently produced. However, even under these conditions, if the discharge intensity in the tube is too great, the efficiency of production of the ultraviolet light is substantially decreased than if said intensity were of a lower order of magnitude. Tests have also shown that when a lamp is operated as taught in the present application, with the envelope exposed to the outside air, the discharge intensity required to produce the pressure range called for is the proper current density to secure a substantial maximum of efficiency of production of the ultraviolet light from the mercury vapor. It will be seen that no consideration of the foregoing was had before the Board of Appeals or was involved in the cancelled claims referred to by the Primary Examiner."

The attorney argued that claim 16 was "also free from any question of estoppel as well as being patentable over the prior art"; that claim 16 was "drawn to the lamp itself as concerns its surface area and the normal intensity of the discharge which is maintained therein." He wrote:

"The allowance of such a claim to the applicant is necessary for the complete protection of this new aspect of the applicant's invention. As a practical matter, lamps of the type described and claimed are made by lamp manufacturers, and are sold in the open market to consumers who place them in a circuit and actually operate them. Actually the manufacturer is the one who determines the size of the envelope and the current density which is to be maintained therein because he knows definitely the apparatus in which it is to be used. Therefore he is really the infringer of the invention. If only method and circuit claims were allowed to the applicant, it might be necessary for him to sue individually the consumer which would

be entirely impractical, and to hold the original manufacturer on the ground of contributory infringement which introduces various difficulties and disabilities which would not exist if the applicant were to secure the article claim. Since the facts involved as to claim 16 are substantially the same as those regarding claims 22 and 26, it is respectfully submitted that claim 16 should likewise be allowed to the applicant herein."

The above makes it abundantly clear that Raytheon was trying to get its reissue patent in such shape that it could sue the "lamp manufacturers," i. e. General Electric and perhaps Hygrade. In December 1939 the fluorescent lamps were being widely used.

The applicant's attorney must have felt encouraged by his interview because on January 20, 1940, he submitted still further amendments—two in respect to the specification. For the word "must," before the phrase "be between 1 and 8 microns," the amended specification substituted the words "preferably should"; and for the word "necessary" he substituted the word "desirable," before the clause "to maintain the mercury pressure within critical limits." There were other amendments to the specification, some of slight importance, except the reference to the drawings as being "drawn to scale" instead of "substantially two thirds full size."

Claims 1, 6, 7, 11, 12 and 13 were rewritten as claims 30 to 35 inclusive. The applicant for the reissue patent also added claims 36 to 45 inclusive in which the pressure of the "mercury vapor," "sodium vapor," or "metallic vapor," was specified as "in the range of one to twenty microns" or "below twenty microns."

The amendment to the specification was explained by applicant's attorney as follows:

"The above amendments to page 1 of the specification are in the interest of harmony with the rest of the specification. For example, the reference on page 2, line 24, to one to twenty microns is a numerical example of the 'narrower limits' specified on page 2, line 10. Thus one to eight microns given on page 1 is the preferred mode of operation."

[That explanation did not explain the real reason for the amendment to the specification. It attempted to minimize a serious and vital amendment which, together with the additional claims sought, would broaden the invention to embrace the known micron pressure of the mercury vapor in some of the new and popular fluorescent lamps.]

The applicant's attorney made the same argument for the use of a 1 to 20 micron range in the newly filed claims, even though the Board of Appeals had rejected claims 36, 37, 38 and 44 of the original patent application because they contained the wider range of 1 to 20 microns.

On January 22, 1940, the applicant's attorney submitted sume further amendments to the specification—allegedly "in the interest of harmonizing the wording of the specification with that of the claims." On January 25, 1940, he asked that claim 1 of the reissue application (for which claim 30 had been substituted) be reinstated as claim 46—"in order to afford the applicant the protection to which he is entitled." On January 23, 1940, LeBel made affidavit that the subject matter of the amendments set forth in the reissue application "was part of his invention, was invented before he filed his said original application."

In order to broaden still further the scope of the invention covered by the original application and the claims of the patent issued thereon, further amendments were filed February 21, 1940. (Hygrade had acquired an interest in the patent February 1, 1940.) Some of the amendments dealt with the size of the lamp.

The original application had referred to Figure 1 as showing a preferred embodiment of lamp "of substantially two-thirds full size" and a circuit for energizing said lamp. In place of the quoted words the amendment substituted—"drawn to scale," and after the word "lamp" it added—"The full size cross-sectional diameter of the light-generating cylindrical portion is about one inch." At still another part of the specification referring to Figure 4 the amendment stated that the light generating bulb portion was about 1½ inches—and as to Figures 1 to 4 the cross section was stated to be "preferably of the order of 1 to 2 inches." The original specification referred to Figure 4 as showing in true form, "at substantially full size" an electrodeless induction lamp. Of course the various sizes of the General Electric fluorescent lamps were then generally known. The relationship of the lamp size to the other elements in the efficient operation of the fluorescent lamp had been fully

524

explained in the Inman and Thayer article of June 1938. (Ex. 4.)

Applicant's February 21, 1940, amendments also added four new claims, 47 to 50 inclusive. Of these claims Nos. 47 and 48 referred to the container as "of the order of magnitude of one or two inches." In the "Remarks" accompanying the requested amendment counsel discussed the British patent No. 307,982 of March 21, 1929, and asserted that "the applicant's claims, which specify the region from 1 to 20 microns, as well as the other pressure regions defined, are all outside of the true scope of the disclosure of the British patent." He also stated that "newly discovered evidence not before in the possession of either the applicant herein or his assignee shows the applicant actually made his invention before the effective date of the British patent" and that "in order to expedite the prosecution of his case, an affidavit under Rule 75 by the applicant LeBel is submitted herewith."

### LeBel's Invention—Date of Conception and Reduction to Practice

The LeBel affidavit was sworn to February 1, 1940. LeBel described certain experiments he had made prior to April 11, 1929, and lamps he had built prior to that date which were tested at the laboratories of Raytheon, Inc., in Cambridge, Mass. He mentions a Dr. Stockbarger of M. I. T., to which a lamp was submitted for radiometric measurement. Mr. Laurence Burns, an assistant to Dr. Stockbarger, was alleged to have actually made the measurements and entered the results in a note book all prior to April 11, 1929. LeBel wrote a report when he received those measurements. Other lamps went through the same course for measurements and reports. Annexed to the affidavit were ten exhibits, all of which appear also as exhibits submitted by LeBel in the record of a later LeBel-Prouty interference proceeding.

The Examiner, on February 28, 1940, had suggested three claims, found allowable, for the purpose of an interference proceeding with a patent application of Willis O. Prouty, whose assignee was the Westinghouse Electric & Manufacturing Co. LeBel adopted said claims as 51, 52 and 53 of his application and on April 4, 1940, the Examiner declared an interference on said three claims with claims 9, 10 and 11 of Prouty. On June 7, 1940, LeBel in a sworn preliminary statement claimed that in February 1928 he had made

the first drawing of his invention, disclosed it to others and constructed certain test lamps; "that the invention was first reduced to practice on or about February 1928" and "that on or about February 1928, he began exercising reasonable diligence in adopting and perfecting the invention."

In February and March 1941 LeBel took a great volume of testimony (435 pages, Ex. TTT herein) and offered some 126 exhibits (most of them bound as a single volume, Ex. SSS-2 herein). One of the witnesses was Mr. Burns. Included in the exhibits were the ten annexed to LeBel's affidavit of February 1, 1940, in the File Wrapper.

The Board of Interference Examiners filed their decision September 23, 1941 (Ex. 57 herein). Prouty had filed an application on February 18, 1939 for a reissue of Patent No. 2,093,735 which had been granted September 21, 1937, on application Serial No. 524,649 filed March 23, 1931. LeBel's application was filed May 24, 1939 for a reissue of Patent No. 2,126,787 which had been granted August 16, 1938 on application Serial No. 385,707 filed August 14, 1929.

The Board in its decision September 23, 1941 (Ex. 57) reviewed the contention of the respective parties on the issues presented by the three counts, which later appeared as claims 45, 46 and 47 of the LeBel reissue patent No. 21,954. Concerning Prouty's invention the Board wrote:

"From the testimony introduced on behalf of Prouty it appears that prior to his filing date all that he conceived was a lamp operating at some unknown but not too hot temperature which had an output of ultra violet light the intensity of which, in the critical range of 2000 to 2540 Angstrom units, was unknown. Consequently Prouty's construction of these lamps and his testing thereof failed to establish either a conception or reduction to practice of the invention in issue. Accordingly, Prouty is not entitled to prevail."

The Board felt that, in view of the voluminous testimony, it was proper "to consider briefly the LeBel record and to place our views relative thereto upon the record." The following is quoted from the Board's decision:

"It appears that prior to April, 1928, LeBel was making various experiments upon rectifiers and in these experiments he noted various peculiarities in gaseous

discharges. This led to the making of tubes for the study of gas discharges. Several tubes in spiral or bee hive form were made of Vita-glass and these tubes were tested by the M. I. T. Laboratories. Tests on these tubes in various ranges of light production revealed that in the far ultra-violet region, namely, 2000 to 2900 Angstrom units, the intensity of light varied from 1% to, in one case, Exhibit 12, as high as 13%. LeBel testified that these percentages of far ultraviolet light were remarkable and extremely surprising inasmuch as Vitaglass was not presumed to transmit wave lengths below 2900 Angstrom units. He therefore reasoned that in order to produce this percentage of far ultraviolet light within the lamp there must have been produced a very high intensity of light in the far ultraviolet region and particularly in the region of 2000 to 2540 Angstrom units and that consequently the construction and testing of these lamps established a conception and reduction to practice of the invention in issue.

\* \* \* \* \*

"It is notable that LeBel as late as January 19, 1929, after more than thirty lamps having Vitaglass envelopes were tested for percentages of light in the various ranges, stated that construction was started on tubes of Vitaglass having a quartz window at the middle and in his report of Exhibit 36, LeBel states 'It is expected that this will prove or disprove the theory of the enhancement of the line 2537 by the presence of gas'. It therefore appears that at the time the tests were made the question of whether there was a high intensity in the region of 2537 Angstrom units generated in the lamp was merely a theory which had not been proven and was not considered as proven by LeBel himself. In our opinion both the spiral lamps of early construction and the somewhat later dumbbell shaped lamp all constructed of Vitaglass fail to establish either conception or reduction to practice of the invention in issue. Likewise it is to be noted that in all the tests on these lamps there was no test as to the operating temperature and consequently it has not been established that these lamps could be readily handled, as required by the counts in issue."

The Board's decision also contained a statement of what LeBel claimed in his original patent application in respect to the critical pressure of 1 to 8 microns for the mercury vapor. I quote the following from the Board's decision:

"In this regard it is to be noted that LeBel, in speaking of a high intensity of ultraviolet light in the range of 2537 Angstrom units, specifically refers to a lamp in which the gas pressure is maintained between 1 and 8 microns. It is true that LeBel speaks of a wider range of mercury vapor pressure of from 1 to 20 microns but it is to be noted that where the wider range is referred to there is also the statement that at higher pressures the light from the lamp is changed and at the higher pressures the lamp does not emit as great a portion of its energy in the narrow region of the ultraviolet spectrum as is true when the mercury vapor pressure is maintained within the smaller limits. It therefore appears, as far as the record is concerned, that high intensity in the original 2537 Angstrom units is only achieved when the mercury vapor pressure is maintained at a low value and it does not here necessarily follow that this high intensity will be achieved when the pressure is between 12 and 13 microns."

Defendant argues here that the decision of the Board of Interference Examiners on the issue of LeBel's date of conception of his invention and its reduction to practice was "obiter dictum" and carries no weight in the present litigation. True, the Board could have rested its decision on the failure of Prouty to establish for himself an earlier date than the date of filing of the Prouty application. Since Prouty's was the junior application that would have been the end of the interference. But LeBel's date was also an issue before the Board. The Board was within its rights in deciding that issue. If an appellate tribunal disagreed with the Board as to Prouty's date, it might want to know what the Board had concluded as to LeBel's date. A trial court's judicial determination of an issue presented by the pleadings is not "obiter dictum" because the court's decision on another issue would dispose of the case. Indeed, it is the better practice for a trial court in a patent case to rule on both the validity of a plaintiff's patent and on defendant's alleged infringement, even though a decision adverse to plaintiff might be based on one or the other issue alone. I think defendant fails to distinguish between "judicial dictum" and "obiter dictum": the latter a per-

sonal opinion of a judge on a collateral question uttered "by the way"; the former a deliberate judicial determination of a question directly involved in the litigation, although not necessary or essential to a decision of the case. [See, 29 Words and Phrases, Perm.Ed., p. 14 and cases cited therein.]

The cases hold that one who seeks to antedate a reference in a patent suit by proving conception and reduction to practice of the invention of the patent under attack, prior to the filing date of the application for said patent, must shoulder a heavy burden which can be carried successfully only by the production of proof of the absolute character required in a criminal case. United Shoe Machine Corporation v. Brooklyn Wood Heel Corporation, 2 Cir., 77 F.2d 263. If the issue has already been decided by the Board of Interference Examiners in the Patent Office the defeated party must make it "convincingly clear that a mistake has been made." Powell v. McNamara, 2 Cir., 74 F.2d 750, citing Morgan v. Daniels, 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657. See, also, Curtiss v. Janin, 2 Cir., 278 F. 454.

In the present suit defendants have submitted the printed record of the LeBel-Prouty interference (Ex. TTT) and many of the exhibits thereof (Ex. SSS–2) and have stated on the record that defendants offer only the testimony of the LeBel witnesses in Exhibit TTT and rely only upon such of the exhibits of the LeBel and Prouty interference as are listed on Exhibit SSS–2.

At the trial defendant supplemented the record of the interference proceeding by further testimony of a former witness in that proceeding, Dr. Knobel, who testified that he recently made a lamp (Ex. VVV) like that described on Exhibit 14 of the Prouty-LeBel interference. Dr. Knobel used a tube of ordinary glass, not vitaglass, and a neon mercury gaseous mixture. He varied the temperature of the lamp (immersed in oil) and watched the gaseous contents change from a predominantly red color to a predominantly blue color. He could take no measurements of any ultraviolet light generated within the bulb because ordinary glass is not pervious to ultra-violet rays. His testimony added nothing of any importance to the record in the LeBel priority interference proceeding.

At the time of the interference proceeding all the original LeBel experimental lamps and tubes (about 26 in number) had either lost their gas or were for other reasons totally inoperative. LeBel's attorney undertook to have reproductions made (Exs. 108, 110 and 112) of the three earliest LeBel lamps (Exs. 50, 80 and 81), but no measurements were made as to the distribution of the radiation energy of the reproduced lamps. Those lamps were themselves inoperative at the time of the present suit. There are no construction card records of Exhibits 50, 80 and 81 of the LeBel-Prouty interference. There is no way of comparing (Ex. 51) the radiation record of Exhibit 50 (the spiral vitaglass glow lamp) with any radiation record of the reproduced lamp, Exhibit 108.

The LeBel experimental lamps did not use quartz until early February 1929. Without the quartz LeBel could not measure the actual radiant energy of the lamp in the form of ultra-violet light having a wave length of about 2537A. His asserted invention or discovery is that he got as much as 65% of the total radiant energy in this wave length, by keeping the mercury vapor range within 1 to 8 microns. He could not have discovered that prior to February 1929 because he could not have measured the amount of ultra-violet radiation inside the tube of vitaglass. He did not get his tubes with quartz windows until January 28, 1929. "Until the inventor knows what he has done so that he can * * * duplicate it, there can be no reduction to practice." Electro etc. Co. v. Krupp etc. Co., D.C., 33 F.Supp. 324, 328; affirmed 3 Cir., 122 F. 2d 314, 318. LeBel may have had a theory before that date, developed in the course of his experiments. What that theory was is referred to in his own report dated January 19, 1929 (mentioned in the opinion of the Board of Interference Examiners, Ex. 57), when he was preparing to have the vitaglass tubes made with a quartz window. He wrote: "It is expected that this will prove or disprove the theory of enhancement of the line 2537 by the presence of gas" (Interference Ex. 33). There is nothing in that about a range of 1 to 8 microns as the necessary pressure for the mercury vapor. The Belgian patent to Phillips had been issued November 30, 1928. I fully agree with the opinion of the Board of Interference Examiners deny-

ing LeBel any date of the conception of his invention and its reduction to practice earlier than the date he filed his original application for a patent, August 14, 1929.

On October 14, 1941 (almost seventeen months after the present suit was commenced), the LeBel original application was further amended so that the specification would contain the statement: "Thus the lamp is a comparatively low voltage lamp inasmuch as the starting voltage is of the order of less than 200 volts and the operating voltage is still lower." Further, claims 54 to 58 were added, to follow claim 46, and claims 59 to 60 were added to follow claim 53. Claims 54 to 58 inclusive were copies of claims 6, 7, 11, 12 and 13 as of July 29, 1939. The "Remarks" of the attorney show that the new claims 59 and 60 were identical with claims 31 and 16 as amended "with the added limitation of 'a thermionic cathode comprising a metal body associated with a material of higher electron emissivity and a co-operating electrode' and also the limitation that the device is 'a low voltage device.' " This, of course, was but a further attempt to expand the LeBel patent to cover the General Electric fluorescent lamps in certain additional particulars, relating to the cathode and voltage used. The description of the thermionic cathode appears to have been borrowed from claims 11 and 13 of the Hull patent in suit.

### The LeBel Application for a Reissue Patent Should Have Been Rejected

Despite the opinion of the Board of Interference Examiners in the LeBel-Prouty case, which as late as September 23, 1941, pointed out the critical range of 1 to 8 microns of LeBel's original application; despite the decision of the Board of Appeals, July 19, 1937, on claims 37, 38, 39 and 44 of LeBel's original application; and despite the Examiner's express opinion of July 29, 1939, that LeBel had shown no reason justifying a reissue patent—despite all that, LeBel was granted Reissue Patent No. 21,954 on November 25, 1941, containing in all forty-nine claims. The entire application for the LeBel reissue patent should have been refused by the Patent Office and the applicant should have been left to his remedy of an appeal to the C.C.P.A., or an equity suit. [R.S. §§ 4911 and 4915.] LeBel should not have been allowed claims in the reissue application for a mercury vapor range of 1 to 20 microns. His orig-

inal application had specified 1 to 8 microns as the critical range, as the "mercury range", as one that the LeBel lamp "must" have. He was obliged by the ruling of the Examiner on the original application and of the Board of Appeals to hold to the 1 to 8 micron range. In view of the Board of Appeals decision and in order to avoid the cited prior art LeBel had withdrawn his 1-20 micron claims and had asked that the original patent be issued without them. That gave rise to an estoppel. In Mackay Co. v. Radio Corporation, 306 U.S. 86 at page 102, 59 S.Ct. 427, at page 434, 83 L.Ed. 506, it was held that an applicant who avoided prior art by defining wires and wave lengths with mathematical precision, "cannot discard that precision to establish infringement."

As hereinbefore indicated the LeBel reissue claims were so extended and broadened beyond the disclosures of the original invention that they were no longer for the same invention. The change from "must" and "necessary" to "preferably" and "desirable", when applied to an allegedly essential element of the claimed invention, such as the range of the mercury vapor pressure in this case, is a material and fundamental change.

In the frequently cited case of Railway Co. v. Sayles, 97 U.S. 554, 563, 24 L.Ed. 1053, Mr. Justice Bradley delivered the opinion of the court. In discussing amendments to an original application, which embodied a material addition to or variance from the original, he stated that any such addition or variance cannot be sustained on the original application. The following quotation from his opinion is directly in point:

"The law does not permit such enlargements of an original specification, which would interfere with other inventors who have entered the field in the meantime, any more than it does in the case of reissues of patents previously granted. Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration, or to appropriate that which has, in the meantime, gone into public use."

See, also, Mahn v. Harwood, 112 U.S. 354 at page 359, 5 S.Ct. 174, 6 S.Ct. 451, 28 L.Ed. 665.

There is nothing legalistic in the words "must" and "necessary." They are in common use. LeBel knew what they meant and he certainly knew the meaning of the scientific terms. There was no ambiguity in the original LeBel patent. LeBel's assertion that he did not understand the terms used in the patent application and that his lawyer did not understand what LeBel told him, is not supported by the File Wrapper on the original application.

The United States Supreme Court in U. S. Industrial Chemicals Inc. v. Carbide & Chemicals Corporation, 315 U.S. 668, 62 S. Ct. 839, 86 L.Ed. 1105, suggests the proper test in reissue cases—a comparison of the disclosure of the two instruments:

"If there be failure of disclosure in the original patent of matter claimed in the reissue, it will not aid the patentee that the new matter covered by the reissue was within his knowledge when he applied for his original patent. And it is not enough that an invention might have been claimed in the original patent because it was suggested or indicated in the specification. It must appear from the face of the instrument that what is covered by the reissue was intended to have been covered and secured by the original" 315 U.S. at page 676, 62 S.Ct. at page 843, 86 L.Ed. 1105.

An excuse like LeBel's, that he did not intend the limitation in the original patent and had so informed his lawyer, was expressly held insufficient in Monogram Mfg. Co. v. Glemby Co., 2 Cir., 136 F.2d 961, at page 963, where the Circuit Court of Appeals for the Second Circuit said that "the test must be what was fairly disclosed as essential in the original." Here we have no facts to support a contention that there was "a bona fide mistake in filing [which] has been held sufficient to justify a reissue even with slightly broadened claims." Monogram Mfg. Co. v. Glemby, supra, citing Miller v. Brass Co., 104 U.S. 350, 26 L.Ed. 783 and Topliff v. Topliff, 145 U.S. 156, 12 S.Ct. 825, 36 L.Ed. 658, R.S. § 4916. To the facts disclosed by the File Wrapper history of LeBel's original patent application and his application for a reissue patent, the following quotation from Russell v. Dodge, 93 U.S. 460 at page 464, 23 L.Ed. 973, seems apposite:

"The evident object of the patentee in seeking a reissue was not to correct any defects in specification or claim, but to change both, and thus obtain, in fact, a patent for a different invention. This result the law, as we have seen, does not permit."

Further, right of the public and rights of General Electric have intervened through the manufacture and sale of fluorescent lamps. Schriber Co. v. Cleveland Trust Co., 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34; Sontag Chain Stores Co. v. National Nut Co. of Cal., 310 U.S. 281, 60 S.Ct. 961, 84 L.Ed. 1204; Picard v. United Aircraft Corporation, 2 Cir., 128 F.2d 632. The General Electric fluorescent lamps had been listed on a General Electric special sales schedule November 29, 1937 and were on a regular sales schedule on April 1, 1938. The General Electric germicidal lamp was on the market in November 1938.

## Non-Infringement of the Claims of LeBel Reissue Patent

The pressure of the mercury vapor is affected by the temperature of the air. The General Electric fluorescent lamps operate under varying degrees of ambient temperature. Some of the lamps in some climates operate with mercury pressures between 1 and 20 microns. Some of them operate within the mercury vapor pressure range of 1 to 8 microns, under some conditions; others never do; and none so operate under all conditions. As counsel for plaintiff puts it—"It cannot be that a lamp which, when operated in summer does not infringe this LeBel patent, does infringe it when operated in winter." Or that the lamp would infringe if operated in Maine but not if operated in Louisiana. The fact is that the General Electric lamps operate over a wide range of temperatures and so have commercial value. LeBel in applying for a reissue patent with broadened claims argued that his lamp would be inoperative if limited to the range of 1 to 8 microns. Yet that was the range he declared was "necessary" in the original application and one that he suggested could be maintained by having sufficient cooling surface in the tube structure or "by artificially cooling the tube." The General Electric lamps use no means to maintain a mercury vapor pressure in the 1 to 8 micron range.

## Prior Art Cited Against LeBel's Patent

Defendant's efforts to establish a date of conception of LeBel's invention and its reduction to practice earlier than the date (August 14, 1929) when the original LeBel application was filed was directed principal-

ly against the citation of the Belgian patent No. 355,093 to Philips granted November 30, 1928 (Ex. 37C). A comparison of the Philips Belgian patent with LeBel's reveals that everything LeBel claimed to have discovered and each step of his invention were clearly and precisely anticipated by Philips.

The Belgian patent to Philips opens with the sentence:

"The subject matter of the present invention is an electric discharge tube intended for the emission of ultra violet light."

He states that he has noted " * * * that the yield in ultra violet light can be considerably increased if the mercury vapor pressure is low, this yield increasing proportionally with the decrease of the mercury pressure"—and that it has been found " * * * that at a lower temperature the radiation in the visible part of the spectrum decreases, while the ultra violet light, especially the mercury line, at a wave length of 2536 Angstrom, is very pronounced." He then tells how his Electric Discharge Tube is constructed, how it operates, and its temperature and mercury vapor pressure during operation. He used a positive column electric discharge tube filled with a rare gas and a small quantity of mercury. The wall of the tube was either partly or entirely of a substance transparent to ultra violet light. The tube had "an incandescent cathode, for example a so-called 'Wehnelt' cathode * * *." "In certain cases it may be advantageous to provide an auxiliary anode to facilitate the ignition of the discharge tube * * *. The incandescent cathode is constituted by a tungsten wire on which there has been wound a nickel wire which has been subsequently covered with barium oxide. * * * The anode is of carbon. * * *" The rare gas argon is "under a pressure of about 4 mm." The tube can be made "to operate with direct current or with alternating current." "When operating, the discharge tube has a temperature of about 50° C., which corresponds to a mercury pressure of about 0.02 mm." [Instead of 20 microns this should be 12.7 microns for 50° C. according to the International Critical Tables.]

The discharge tube "can operate with a weak current density." "By cooling the electric discharge tube, it is possible to assure that even at higher current intensities, the mercury pressure in the discharge tube will remain very low." The "addition of another gas to the mercury vapor brings about the excitation of a number of mercury molecules sufficient to obtain the desired radiation."

The Philips Belgian patent was applied for on October 19, 1928 and was "attached to the Ministerial Decree of November 30, 1928," which was the date of its issuance. The date of its publication was January 19, 1929, three months from the date when the application was filed. Defendant claims that in this proceeding the effective date of the Belgian patent should be fixed at the publication date, January 19, 1929. Plaintiff contends that the date Philips invention was patented in Belgium was the date of the decree issuing the patent, November 30, 1928. I think the plaintiff is right. See, Sirocco Engineering Co. v. B. F. Sturtevant, 2 Cir., 220 F. 137 and R.S. § 4886.

An article by Abraham Lincoln Marshall published November 5, 1927, in the Journal of the American Chemical Society on the subject "Hydrogen Peroxide Formation Photosensitized by Mercury Vapor" (Ex. 37B), describes some experiments with variable mercury arc temperature. The author states: "This indicates that under these conditions the optimum concentration of mercury vapor for securing the largest amount of resonance light is about 0.01 mm." (10 microns). At the end of the Article he repeats this conclusion: "The mercury vapor lamp gives the most resonance radiation ($\lambda 2536.7A$) with a mercury pressure of about 0.01 mm." Although the paper was prepared primarily in "an effort to clear up some of the uncertain points in the photochemical combination of hydrogen and oxygen when sensitized to a $\lambda 2536.7A$ from a cold mercury arc by means of a mercury vapor," it naturally concerned itself with the temperature and the mercury vapor pressure at which the largest amount of resonance light could be produced.

Hugh Stott Taylor filed an application for a patent February 1, 1926, for a "process of making hydrogen peroxide." The patent No. 1,659,382 was issued February 14, 1928 (Ex. 37A). Marshall and Taylor had collaborated on this problem. Taylor's specification stated:

"This invention differs fundamentally from a large number of other processes achieved photochemically in that the activating energy is not the whole region of ultra-violet light but a very special fraction

thereof, namely, the so-called resonance radiation, occurring mainly at the centre of the mercury line situated at about a wave length of 2536.7 Angstrom units."

"To facilitate the emission of resonance radiation from a mercury arc it is necessary to have in the arc system a low pressure of mercury vapor. Otherwise the activating resonance radiation does not leave the mercury arc vessel, but is absorbed by the mercury vapor in the arc system itself. It is for this reason that I have found it desirable to work with a cooled mercury arc," for which he recommends "a stream of running cold water."

G. L. Hertz filed an application for an electric discharge tube February 18, 1925, and patent No. 1,726,107 was issued to him August 27, 1929 (Ex. 33E). The specification taught that in a gaseous filled tube with positive column light, a filling of argon and mercury vapor would operate on a lower voltage than a filling of neon and mercury. The argon was to have a pressure of about four millimeters. Hertz's discovery seems to have been (1) that at certain temperatures an electric discharge tube with a filling of neon gas and mercury vapor when operated will produce first the blue mercury light which changes to the red neon light, but that when the filling is argon gas and mercury vapor the light produced is not that of the argon gas but mercury light from the mercury vapor; and (2) that the tubes with an argon mercury filling will operate at a lower voltage than the tubes with a neon mercury filling. At least Hertz taught the combination of the argon and mercury in an electric discharge tube, the pressure of the argon as above 4 mm. and the fact that such a tube would operate on a lower voltage than a tube with a filling of neon and mercury.

Further, there are the teachings of the Meyer, Spanner and Germer patent No. 2,182,732 issued December 5, 1939, on an application filed December 19, 1927, which have been discussed in another part of this opinion. Meyer taught all that LeBel claimed as his invention *except* a specific pressure of the mercury vapor during operation of the lamp, which, of course, would vary with the temperature of the tube, and except a specific range of pressure of the argon gas, which Hertz had used at about 4 mm.

LeBel disclosed nothing new in his original specification. His reissue patent is void for reasons hereinabove stated. The defendant's counterclaim on the LeBel patent will be dismissed on the merits.

The Government's Motion to Intervene

While this patent suit was on trial the United States filed a motion "* * * for leave to intervene as a defendant in this patent suit in order to assert certain defenses set forth in a proposed answer annexed to the notice of motion, 'on the ground that the patents alleged in the complaint to be infringed by articles manufactured, used and sold by the defendant Hygrade Sylvania Corporation, have been used illegally [by the plaintiff, General Electric Company] in violation of the Federal antitrust laws ,and in a manner contrary to public policy.'" I wrote an opinion on the issues thus presented. D.C., 45 F.Supp. 714, 719. At that time there was pending in the District Court of the United States for the District of New Jersey a civil action instituted by the United States of America against the General Electric Company and others (Civil action No. 1364, January 27, 1941) charging alleged illegal combinations of General Electric Company and others in the manufacture and sale of incandescent lamps, with some reference to agreements covering fluorescent lamps. I denied, without prejudice to a renewal, the Government's motion for leave to intervene herein, stating:

"* * * After I have prepared my opinion on the patent issues, I shall again survey the situation in respect to the antitrust suits and the attitude of the defendant in respect to the charges contained in the Government's proposed answer. If it then appears advisable to have the Government renew its motion to intervene, I shall so advise the Attorney General and no decree will be entered in this patent suit before that.

"The Government's motion for leave to intervene in the patent suit is denied, without prejudice to a renewal at such time as the Court may indicate."

An order was entered accordingly.

Later an anti-trust suit was instituted by the Government against General Electric and others in the District Court in New Jersey charging an illegal combination in restraint of trade against General Electric Company and others in relation to agreements governing the manufacture and sale of fluorescent lamps by licenses of General Electric (Civil action #2590, December 9,

1942.) Apparently that suit presents the same issues as the Government wished to raise by its answer if granted leave to intervene in the present litigation. I assume that the trial of the two anti-trust suits has been held up by the essential war activities of General Electric's officers and its personnel. The defendants herein definitely stated on the record at the end of the trial that they did not intend to raise the issue of "unclean hands" or "public policy," by amending their answers herein to plead a violation of the anti-trust laws by plaintiff in making licensing and other agreements involving plaintiff's patents in suit. Thus, if the issue is to be presented and decided in this litigation the Government will have to renew its motion for leave to intervene and file an answer herein. If the Government would prefer to try first its New Jersey anti-trust suit against plaintiff and have the entry of a decree in this patent suit stayed pending the decision of the New Jersey suit, it may move herein for that relief. The Government will therefore inform the Court of its plans and move accordingly. Meanwhile no interlocutory decree will be entered on the decision (Findings of Fact and Conclusions of Law) which I am filing herewith, determining the issues presented by the present litigants as to the validity of the patents, their infringement, and related matters.

In the course of the trial some mention was made of the great number of war plants supplied with fluorescent lamps manufactured by Hygrade Sylvania Corporation and the harmful effect on the war effort if an injunction were issued herein. Whether or not an injunction should issue in view of Hygrade's infringement need not be decided at this time because the issue of "unclean hands" and "public policy" may be raised against General Electric Company if the Government is permitted to file an answer herein. However, on the showing already made as to the validity of the General Electric patents and their infringement by the Hygrade Sylvania Corporation it may be advisable to protect General Electric Company to the extent of requiring the defendants to furnish a bond.

If the Government's motion is renewed and is granted, there will then be added to this long involved patent litigation, the trial of an anti-trust suit which the General Electric Company's counsel stated would take about five months, and the trial will not

be possible until the end of the war. Those circumstances may require that the defendants Hygrade Sylvania Corporation and Raytheon Manufacturing Company be ordered to furnish a bond to assure the payment to the plaintiff of any judgment for damages and profits it may eventually recover, if the decision on the patents prevails and if the Government's contentions are not sustained. Plaintiff may apply for that relief, after the Government's motion has been made and decided.